## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PAWNEET ABRAMOWSKI, AMANDA ABRAMS, AG MORTGAGE VALUE PARTNERS MASTER FUND, L.P., AG OFCON, LTD., AG SF MASTER (L) L.P., AG TCDRS, L.P., DR. MADELYN ANTONCIC, ARYEH BATALION, BAY POND INVESTORS (BERMUDA) L.P., BAY POND PARTNERS, L.P., WALTER BEACH, BLACKWELL PARTNERS LLC – SERIES A, JEFFREY BLOMSTROM and RAPHAEL LICHT AS TRUSTEES OF DGC FAMILY FINTECH TRUST, LESTER BRAFMAN, JOHN BUTLER, EDWARD CAHILL, CENTER FOR RIGHTEOUSNESS & INTEGRITY INC., JOHN CHRYSTAL, BETSY H. COHEN, DANIEL COHEN, COHEN CIRCLE, COHEN AND COMPANY, LLC, ERICA DELFORNO, RYAN GILBERT, HANCOCK FUNDING, LLC, JONATHAN COHEN AS TRUSTEE OF HEPCO FAMILY TRUST DTD 4/28/11, ITHAN CREEK MASTER INVESTORS (CAYMAN) L.P., JOHN LEE AS TRUSTEE OF JOHN LEE FAMILY TRUST, HERSH KOZLOV, JEREMY KUIPER, JUDITH LEWKEWICH, DIANA LIBERTO, RAPHAEL LICHT, PAUL LICHTMAN, DOUGLAS LISTMAN, DANIEL LONG, JOHN MCGLYNN AS TRUSTEE OF M1 REVOCABLE TRUST, MAIN STREET GLOBAL, LLC, FRANK MASTRANGELO, JAMES J. MCENTEE, III, NANTAHALA CAPITAL PARTNERS LIMITED PARTNERSHIP, NANTAHALA CAPITAL PARTNERS II LIMITED PARTNERSHIP, SHAMI PATEL, JOSEPH POOLER, QUAIL BROOK GS PARTNERS, L.P., ADEEL ROUF, RACHAEL SCHWEON, RICHARD MAIOCCO AS TRUSTEE OF SWARTHMORE TRUST OF 2016, UNION SQUARE PARK INVESTMENTS, LLC, UNION SQUARE PARK PARTNERS, L.P., VELLAR SPECIAL OPPORTUNITIES FUND, LLC – SERIES1, PAUL VERNHES, WILLIAM J. VILLARI, RON WECHSLER, THROOP WILDER, WOLF CREEK INVESTORS (BERMUDA) L.P., AND WOLF CREEK PARTNERS, L.P.,

Case No. _____

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS, BREACH OF CONTRACT AND VIOLATIONS OF THE DELAWARE GENERAL CORPORATION LAW**

Plaintiffs,

v.

NUVEI CORPORATION and PINNACLE
MERGER SUB, INC.,

Defendants.

Plaintiffs Pawneet Abramowski, Amanda Abrams, AG Mortgage Value Partners Master Fund, L.P., AG Ofcon, Ltd., AG SF Master (L), L.P., AG TCDRS, L.P., Dr. Madelyn Antoncic, Aryeh Batalion, Bay Pond Investors (Bermuda) L.P., Bay Pond Partners, L.P., Walter Beach, Blackwell Partners LLC – Series A, Jeffrey Blomstrom and Raphael Licht as Trustees of DGC Family FinTech Trust, Lester Brafman, John Butler, Edward Cahill, Center for Righteousness & Integrity Inc., John Chrystal, Betsy H. Cohen, Daniel Cohen, Cohen Circle, Cohen and Company, LLC, Erica DelForno, Ryan Gilbert, Hancock Funding, LLC, Jonathan Cohen as Trustee of Hepco Family Trust dtd 4/28/11, Ithan Creek Master Investors (Cayman) L.P., John Lee as Trustee of John Lee Family Trust, Hersh Kozlov, Jeremy Kuiper, Judith Lewkewich, Diana Liberto, Raphael Licht, Paul Lichtman, Douglas Listman, Daniel Long, John McGlynn as Trustee of M1 Revocable Trust, Main Street Global, LLC, Frank Mastrangelo, James J. McEntee, III, Nantahala Capital Partners Limited Partnership, Nantahala Capital Partners II Limited Partnership, Shami Patel, Joseph Pooler, Quail Brook GS Partners, LP, Rachael Schweon, Richard Maiocco as

Trustee of Swarthmore Trust of 2016, Union Square Park Investments, LLC, Union Square Park Partners, L.P., Vellar Special Opportunities Fund, LLC – Series1, Paul Vernhes, William J. Villari, Ron Wechsler, Throop Wilder, Wolf Creek Investors (Bermuda) L.P., and Wolf Creek Partners, L.P. (collectively, "Plaintiffs"), by and though their undersigned counsel, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

## I.   NATURE OF THE ACTION AND OVERVIEW

1.     This action arises from Defendants Nuvei Corporation's ("Nuvei") and Pinnacle Merger Sub, Inc.'s ("Merger Sub") refusal to accept Plaintiffs' tender of certain Paya common shares and/or pay them $9.75 per share in cash in connection with Defendants' Offer to Purchase for Cash (the "Offer" or the "Tender Offer") any and all issued and outstanding shares of common stock of Paya Holdings, Inc. ("Paya" or the "Company") for $9.75 per share in cash.  Defendants caused the Tender Offer to be filed with the Securities and Exchange Commission ("SEC") on January 24, 2023.

2.     Defendants structured the transaction as a tender offer merger under Section 251(h) of the Delaware General Corporation Law ("DGCL").   Section 251(h) of the DGCL, among other things, eliminates the need for a stockholder vote on a second-step merger following consummation of a tender or exchange offer for

a publicly listed Delaware corporation where the acquirer could not otherwise execute a short form merger under Section 253 of the DGCL.

3.      Defendants completed their acquisition of Paya (the "Transaction" or the "Merger") on February 22, 2023.

4.      This Action presents a straightforward case where the Federal securities laws, the DGCL and the merger agreement in connection with the transaction (the "Merger Agreement") all required Defendants to accept Plaintiffs' tender of certain common shares and/or pay *all* Paya common stockholders, including Plaintiffs, $9.75 per share in cash.

5.      In violation of Federal and Delaware law and in breach of the Merger Agreement, Defendants wrongfully excluded certain of Plaintiffs' Paya common shares from the Offer and failed to accept Plaintiffs' tender and/or pay Plaintiffs $9.75 per share in cash for those Paya common shares.

## II.   JURISDICTION AND VENUE

6.      Plaintiffs' claims arise under Section 14(d) of the 1968 Williams Act amendments to the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(d), SEC Rule 14d-10(a), Section 251(h) of the DGCL, and the Merger Agreement.

7.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

8.     Venue is proper in this district under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1391.

9.     This Court has personal jurisdiction over Nuvei because Nuvei consented to the jurisdiction of this Court in Section 9.9 of the Merger Agreement, which provides:

> Each of the Parties (a) irrevocably consents to the service of the summons and complaint and any other process (whether inside or outside the territorial jurisdiction of the Chosen Courts) in any Legal Proceeding based on, arising out of or relating to this Agreement or the Transactions, for and on behalf of itself or any of its properties or assets, in accordance with Section 9.2 or in such other manner as may be permitted by applicable Law, and nothing in this Section 9.9 shall affect the right of any Party to serve legal process in any other manner permitted by applicable Law; (b) irrevocably and unconditionally consents and submits itself and its properties and assets in any Legal Proceeding to the exclusive general and specific jurisdiction of the Court of Chancery of the State of Delaware and any state appellate court therefrom within the State of Delaware (or, if the Court of Chancery of the State of Delaware declines to accept subject-matter jurisdiction over a particular matter, any other state or federal court within the State of Delaware) (the "Chosen Courts") in the event that any dispute or controversy based on, arises out of or relating to this Agreement or the Transactions; (c) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request from any court, including the Chosen Courts; (d) agrees that any Legal Proceeding based on, arising out of or relating to this Agreement or the Transactions shall be brought, tried and determined only in the Chosen Courts; (e) waives any objection that it may now or hereafter have to the venue of any such Legal Proceeding in the Chosen Courts or that such Legal Proceeding was

brought in an inconvenient or otherwise improper court and agrees not to plead or argue the same; and (f) agrees that it shall not bring any Legal Proceeding based on, arising out of or relating to this Agreement or the Transactions in any court other than the Chosen Courts. Each of Parent, Merger Sub and the Company agrees that a final judgment in any Legal Proceeding in the Chosen Courts shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

10.    In addition, in connection with the acts, conduct, and other wrongs alleged in this Complaint, Nuvei, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.  This included forming Merger Sub, a Delaware corporation and wholly owned subsidiary of Nuvei which it used to accomplish the Merger.

11.    Nuvei has also purposely availed itself of the laws of the State of Delaware.  Nuvei has formed several Delaware subsidiaries or affiliates, in addition to Merger Sub, including Nuvei Commerce, LLC, Nuvei Technologies Inc., and Nuvei US LLC.  Nuvei holds a Delaware Money Transmitter license (#019964) through its wholly owned Delaware subsidiary Nuvei US LLC, pursuant to which Nuvei US LLC has agreed to subject itself to the jurisdiction of the Delaware Office of the State Bank Commissioner.

12.    This Court has personal jurisdiction over Merger Sub because it is a Delaware corporation.

### III.   **PARTIES**

13.   Each of the Plaintiffs held shares of Paya common stock, subject to certain restrictions ("Plaintiffs' Company Common Stock") at the time of the Offer.

14.   Plaintiff Pawneet Abramowski ("Abramowski") held 22,824 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Abramowski satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

15.   Plaintiff Amanda Abrams ("Abrams") held 122,354 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Abrams satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

16.   Plaintiff AG Mortgage Value Partners Master Fund, L.P. held 14,477 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  AG Mortgage Value Partners Master Fund, L.P. satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

17.   Plaintiff AG Ofcon, Ltd. held 27,924 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  AG Ofcon, Ltd. satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

18.     Plaintiff AG SF Master (L), L.P. held 27,758 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  AG SF Master (L), L.P. satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

19.     Plaintiff AG TCDRS, L.P. held 4,084 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  AG TCDRS, L.P. satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

20.     Plaintiff Dr. Madelyn Antoncic ("Antoncic") held 22,824 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Antoncic satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

21.     Plaintiff Aryeh Batalion ("Batalion") held 11,471 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Batalion satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

22.     Plaintiff Bay Pond Investors (Bermuda) L.P. held 21,504 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Bay Pond Investors (Bermuda) L.P. satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

23.    Plaintiff Bay Pond Partners, L.P. held 197,110 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Bay Pond Partners, L.P. satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

24.    Plaintiff Walter Beach ("Beach") held 57,353 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Beach satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

25.    Plaintiff Blackwell Partners LLC – Series A held 112,112 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Blackwell Partners LLC – Series A satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

26.    Plaintiff Jeffrey Blomstrom and Raphael Licht are Trustees of DGC Family FinTech Trust, which held 59,394 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  DGC Family FinTech Trust satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

27.    Plaintiff Lester Brafman ("Brafman") held 38,236 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Brafman satisfied all

conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

28.   Plaintiff John Butler ("Butler") held 19,118 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.   Butler satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

29.   Plaintiff Edward Cahill ("Cahill") held 5,940 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.   Cahill satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

30.   Plaintiff Center for Righteousness & Integrity Inc. held 4,158 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.   Center for Righteousness & Integrity Inc. satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

31.   Plaintiff John Chrystal ("Chrystal") held 57,353 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.   Chrystal satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

32.   Plaintiff Betsy H. Cohen ("B. Cohen") held 5,940 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.   B. Cohen satisfied all

conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

33.     Plaintiff Daniel Cohen ("D. Cohen") held 59,394 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  D. Cohen satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

34.     Plaintiff Cohen Circle, LLC ("Cohen Circle") held 2,182,906 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Cohen Circle satisfied all conditions to validly tender these shares in response to the Offer. But Nuvei or its agent rejected that tender.

35.     Plaintiff Cohen and Company, LLC ("Cohen and Company") held 17,818 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer. Cohen and Company satisfied all conditions to validly tender these shares in response to the Offer.  But Nuvei or its agent rejected that tender.

36.     Plaintiff Erica DelForno ("DelForno") held 5,940 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  DelForno satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

37.     Plaintiff Ryan Gilbert ("Gilbert") held 5,940 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Gilbert satisfied all

conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

38.    Plaintiff Hancock Funding, LLC held 19,118 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Hancock Funding, LLC satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

39.    Plaintiff Jonathan Cohen is Trustee of Hepco Family Trust dtd 4/28/11, which held 59,394 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.   Hepco Family Trust dtd 4/28/11 satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

40.    Plaintiff Ithan Creek Master Investors (Cayman) L.P. held 87,166 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Ithan Creek Master Investors (Cayman) L.P. satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

41.    Plaintiff John Lee is Trustee of John Lee Family Trust, whichheld 305,883 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  John Lee Family Trust satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

42.     Plaintiff Hersh Kozlov ("Kozlov") held 17,206 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Kozlov satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

43.     Plaintiff Jeremy Kuiper ("Kuiper") held 44,545 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Kuiper satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

44.     Plaintiff Judith Lewkewich ("Lewkewich") held 135,684 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Lewkewich satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

45.     Plaintiff Diana Liberto ("Liberto") held 17,206 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Liberto satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

46.     Plaintiff Raphael Licht ("Licht") held 7,648 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Licht satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

47.     Plaintiff Paul Lichtman ("Lichtman") held 22,942 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer. Lichtman satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

48.     Plaintiff Douglas Listman ("Listman") held 19,118 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Listman satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

49.     Plaintiff Daniel Long ("Long") held 22,942 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Long satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

50.     Plaintiff John McGlynn as Trustee of M1 Revocable Trust, which held 5,736 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer. M1 Revocable Trust satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

51.     Plaintiff Main Street Global, LLC held 182,638 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Main Street Global, LLC satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

52.     Plaintiff Frank Mastrangelo ("Mastrangelo") held 57,353 shares of Plaintiff's Company Common Stock at the time of the Tender Offer.  Mastrangelo satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

53.     Plaintiff James J. McEntee, III ("McEntee, III") held 57,353 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  McEntee, III satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

54.     Plaintiff Nantahala Capital Partners Limited Partnership held 48,134 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Nantahala Capital Partners Limited Partnership satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

55.     Plaintiff Nantahala Capital Partners II Limited Partnership held 97,531 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Nantahala Capital Partners II Limited Partnership satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

56.     Plaintiff Shami Patel ("Patel") held 78,512 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Patel satisfied all

conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

57.    Plaintiff Joseph Pooler ("Pooler") held 19,118 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Pooler satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

58.    Plaintiff Quail Brook GS Partners, L.P. held 80,295 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Quail Brook GS Partners, L.P. satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

59.    Plaintiff Rachael Schweon ("Schweon") held 9,559 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Schweon satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

60.    Plaintiff Richard Maiocco as Trustee of Swarthmore Trust of 2016, which held 161,103 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Swarthmore Trust of 2016 satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

61.    Plaintiff Union Square Park Investments, LLC held 30,589 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Union Square

Park Investments, LLC satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

62.   Plaintiff Union Square Park Partners, L.P. held 122,353 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Union Square Park Partners, L.P. satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

63.   Plaintiff Vellar Special Opportunities Fund, LLC – Series1 ("VSOF 1") held 226,115 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  VSOF 1 satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

64.   Plaintiff Paul Vernhes ("Vernhes") held 19,118 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Vernhes satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

65.   Plaintiff William J. Villari ("Villari") held 22,942 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Villari satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

66.   Plaintiff Ron Wechsler ("Wechsler") held 5,736 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Wechsler satisfied all

conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

67.     Plaintiff Throop Wilder ("Wilder") held 5,940 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Wilder satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

68.     Plaintiff Wolf Creek Investors (Bermuda) L.P. held 13,002 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Wolf Creek Investors (Bermuda) L.P. satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

69.     Plaintiff Wolf Creek Partners, L.P. held 16,753 shares of Plaintiffs' Company Common Stock at the time of the Tender Offer.  Wolf Creek Partners, L.P. satisfied all conditions to validly tender these shares in response to the Offer, but Nuvei or its agent rejected that tender.

70.     Defendant Nuvei is a Canadian corporation headquartered in Montreal, Canada.  Nuvei is a global payment company providing payment technology and solutions to businesses across North America, Europe, Asia Pacific, Middle East, Africa and Latin America.

IV.    **NON-PARTY PAYA**

71.    Paya is a Delaware corporation, formerly known as FinTech Acquisition Corp. III Parent Corp.  Paya is a leading provider of integrated payment and frictionless commerce solutions that help customers accept and make payments, expedite receipt of money, and increase operating efficiencies. Paya processes over $40 billion of annual payment volume across credit/debit card, ACH, and check, making it a top provider of payment processing in the United States.  Paya serves more than 100,000 customers through over 2,000 key distribution partners focused on targeted, high growth verticals such as healthcare, education, non-profit, government, utilities, and other B2B goods and services. The business has built its foundation on offering robust integrations into front-end CRM and back-end accounting systems to enhance customer experience and workflow. Paya is headquartered in Atlanta, GA, with offices in Reston, VA, Fort Walton Beach, FL, Dayton, OH, Mt. Vernon, OH, and Dallas, TX.

V.    **SUBSTANTIVE ALLEGATIONS**

A.    **Paya Is Formed and Becomes a Publicly Traded Company**

72.    In 2006, Paya's predecessor entity, Sage Payment Solutions North America ("SPS"), was established to provide full service, end to end payments solutions focused on software integrations.  In 2017 GTCR, LLC (together with its affiliates, "GTCR") acquired SPS.  On January 30, 2018, SPS announced that it

would begin operating under the new brand name Paya, which it still operates under today.

73.    Over the next several years Paya grew.  On October 17, 2018, Paya launched Paya Connect, a proprietary application programming interface and service-oriented platform.  On November 1, 2018, Paya acquired Stewardship Technologies, which expanded Paya's position in the non-profit space.  In January 2019, Paya acquired First Billing Services which expanded its government and utilities offerings.  Finally on October 1, 2020, Paya closed the acquisition of The Payments Group, which provided integrated payments solutions to over 600 local governments, municipalities, and courts.

74.    On August 3, 2020, GTCR-Ultra Holdings, LLC, GTCR Ultra-Holdings II, LLC, FinTech Acquisition Corp. III Parent Corp., FinTech III Merger Sub Corp., FinTech Acquisition Corp. III, GTCR/Ultra Blocker, Inc., and GTCR Fund XI/C LP entered into a merger agreement (the "FinTech Merger Agreement") which would allow Paya to become a publicly traded company through a de-SPAC transaction (the "FinTech Transaction").  A true and correct copy of the FinTech Merger Agreement is attached hereto as Exhibit 1 and incorporated herein by reference.  A de-SPAC transaction allows a privately held operating company to become a public company by merging with an already public shell company called a special-purpose acquisition company ("SPAC").  When the merger is completed,

the operating company becomes public and gets to use the capital of the now-dissolved shell company.

75.    In connection with the FinTech Transaction, FinTech Investor Holdings III, LLC, 3FIII, LLC, FinTech Masala Advisors, LLC, Betsy Cohen and Daniel G. Cohen (collectively, the "Sponsors") entered into a sponsor support agreement dated August 3, 2020 (the "Sponsor Support Agreement").  A true and correct copy of the Sponsor Support Agreement is attached hereto as Exhibit 2 and incorporated herein by reference. FinTech Acquisition Corp. III, SEC Sponsor Support Agreement filed on February 16, 2021.   The Sponsor Support Agreement incorporates by reference a letter agreement, dated as of November 15, 2018, by and among Fintech investor Holdings III, LLC, Fintech Masala Advisors, LLC, 3FIII, LLC and the insiders listed on the signature pages thereto (the "Letter Agreement"). A true and correct copy of the Letter Agreement is attached hereto as Exhibit 3 and incorporated by reference.

76.    The Sponsor Support Agreement and FinTech Merger Agreement set out certain restrictions on Plaintiffs' Company Common Stock.   The Sponsor Support Agreement, however, specifically recognized that Plaintiffs' Company Common Stock had voting rights.   Section 2.2(ii)(4) provides in pertinent part:

"Subject to <u>Section 1.11</u>, Holders of [Plaintiffs' Company Common Stock] shall be entitled to vote such [Plaintiffs' Company Common Stock] . . ."

77.     Nuvei and Paya benefitted from Plaintiffs' Company Common Stock having voting rights.  For example, pursuant to Section 1.11 of the Sponsor Support Agreement (the "Sponsor Lockup Provision") each of the Sponsors agreed "to be present in person or by proxy and vote or cause to be voted all Holdings Shares beneficially owned by such Sponsor and/or permitted transferee at each annual or special meeting of Holdings at which directors of Holdings are to be elected, in favor of, or to take all actions by written consent in lieu of any such meeting as are necessary to cause the election as members of the board of directors of Holdings (the "<u>Holdings Board</u>") of the Nominees (as such term is defined in the Director Nomination Agreement, to be entered into at the Closing pursuant to the Merger Agreement, by and among Holdings and Seller (as amended or modified, the "<u>Nomination Agreement</u>")) in accordance with, and otherwise to achieve the composition of the Holdings Board and effect the intent of, the provisions of the Nomination Agreement."

78.     The Sponsor Lockup Provision terminated 30 days after closing of the FinTech Transaction and no longer remains in effect.  *See* Sponsor Support Agreement 1.11 ("This <u>Section 1.11</u> shall terminate upon the earlier of (i) Seller's written notice to the Sponsors to any such termination and (ii) 30 days after the

Closing."). Therefore, at all times 30 days after close of the FinTech Transaction, Plaintiffs or their predecessor(s) in interest had the ability to freely vote Plaintiffs' Company Common Stock.[1]

79.    On October 16, 2020, Paya completed the FinTech Transaction.

80.    On October 19, 2020, Paya became a publicly traded company on the Nasdaq Capital Market under the ticker "PAYA."

**B.    DEFENDANTS OFFER TO ACQUIRE PAYA THOUGH A TENDER OFFER PURSUANT TO 8 *DEL. C.* § 251(h) AND WRONGFULLY REFUSE TO ACCEPT PLAINTIFFS' SHARES AND/OR PAY PLAINTIFFS $9.75 PER SHARE IN CASH.**

81.    Paya began exploring a possible sale of the Company in July 2021. As part of that process, in September 2021, Paya contacted several potential acquirers including Nuvei. Following Paya's outreach, Nuvei began merger discussions with Paya on or around September 24, 2022.

82.    On January 8, 2023, Paya's Board held a meeting at which it approved the execution and delivery of the Merger Agreement by the Company and resolved that the Merger Agreement and Merger be governed by and effected by a tender offer pursuant to Section 251(h) of the Delaware General Corporation Law.

---

[1] In connection with the FinTech Transaction, Paya also agreed to issue 14,000,000 common shares, contingent on Paya's stock price reaching certain trading thresholds (the "Contingent Common Shares"). Unlike Plaintiffs' Company Common Stock, the Contingent Common Shares had no voting or other rights unless and until Paya's stock reached the trading price thresholds set forth in Section 4.05 of the FinTech Merger Agreement.

83.     Following the meeting, the Company, Nuvei and Merger Sub executed and delivered the Nuvei Merger Agreement.

84.     Under Section 2.1(a) of the Merger Agreement Defendants agreed to pay Paya common stockholders $9.75 in cash per share of common stock, including for Plaintiffs' Company Common Stock.

85.     Section 2.1(a) of the Merger Agreement, titled "Commencement of the Offer," required [Nuvei] to cause Merger Sub to "commence (within the meaning of Rule 14d-2 promulgated under the Exchange Act) the Offer to purchase **all of the outstanding shares of Company Common Stock** (other than Owned Company Shares) at a price per share of the Company Common Stock equal to the Per Share price to the holder of the share of Company Common Stock, without interest thereon (but subject to applicable withholding)."  Plaintiffs' Company Common Stock was outstanding "Company Common Stock" and thus eligible for tender.

86.     Section 2.1(b) of the Merger Agreement sets forth the "Terms and Conditions of the Offer," none of which permitted Defendants to refuse to accept Plaintiffs' tender of shares and/or fail to pay $9.75 per share for Plaintiffs' Company Common Stock.

87.     Section 2.1(b) states:

> The obligations of Merger Sub to, and of Parent to cause Merger Sub to, accept for payment, and pay for, any shares of Company Common Stock validly tendered (and not validly withdrawn) pursuant to the Offer are **subject only**

**to the terms and conditions set forth in this Agreement**, including the satisfaction or waiver of the Minimum Condition, the Termination Condition and the other conditions set forth in Annex I (collectively, the "Offer Conditions"). The Offer shall be made by means of an offer to purchase (the "Offer to Purchase") that contains the terms set forth in this Agreement, the Minimum Condition, the Termination Condition and the other Offer Conditions. Merger Sub expressly reserves the right (but is not obligated to) at any time and from time to time in its sole discretion to (i) waive, in whole or in part, any Offer Condition, (ii) increase the Per Share Price or (iii) otherwise modify the terms of the Offer only (and Merger Sub shall not do so except) in a manner not inconsistent with the terms of this Agreement, except that, without the prior written consent of the Company, **Merger Sub shall not (i) reduce the number of shares of Company Common Stock sought to be purchased in the Offer** (other than in each case an adjustment made pursuant to Section 2.1(i)), (ii) **reduce the Per Share Price** (other than in each case an adjustment made pursuant to Section 2.1(i)), (iii) amend, modify, supplement or waive the Minimum Condition or the Termination Condition, (iv) directly or indirectly amend, modify or supplement any Offer Condition, (v) **amend, modify or supplement any term of the Offer in any manner that is or would reasonably be expected to be adverse to the holders of shares of Company Common Stock in their capacities as such**, (v)[2] amend, modify or supplement any term of the Offer in any individual case that would, individually or in the aggregate, reasonably be expected to prevent or materially delay the consummation of the Offer or the Merger or impair the ability of Parent or Merger Sub or the Company to consummate the Offer or the Merger, (vi) terminate the Offer (unless this Agreement is terminated in accordance with Section 8.1), accelerate, extend or otherwise change the Offer Expiration Time (in

---

[2] The Merger Agreement repeats subsection "v."

each case, except as expressly required or permitted by the other provisions of this Section 2.1), (vii) **change the form of consideration payable in the Offer** or (viii) provide for any "subsequent offering period" (or any extension of any thereof) within the meaning of Rule 14d-11 promulgated under the Exchange Act.

88.    Further, in Recital "C" Defendants "acknowledge[d] and agree[d] that the Merger shall be governed by and effected pursuant to Section 251(h) of the DGCL and shall be consummated as soon as practicable following the consummation of the Offer upon the terms and subject to the conditions set forth in this Agreement."

89.    Section 251(h)(2) of the DGCL requires that the offeror make the tender "offer for **all** of the outstanding stock of such constituent corporation on the terms provided in such agreement of merger that, absent this subsection, **would be entitled to vote** on the adoption or rejection of the agreement of merger . . ."  Thus, under Section 251(h) "all" shares entitled to vote must be included in the tender offer.  At the time of the Tender Offer, Plaintiffs' Company Common Stock had voting rights and was entitled to vote on a sale of Paya.

90.    In addition, Section 251(h)(5) requires that "[e]ach outstanding share (other than shares of excluded stock) of each class or series of stock of such constituent corporation that is the subject of and is not irrevocably accepted for purchase or exchange in the offer referred to in paragraph (h)(2) of this section is to be converted in such merger into, or into the right to receive, the same amount and

kind of cash, property, rights or securities to be paid for shares of such class or series of stock of such constituent corporation irrevocably accepted for purchase or exchange in such offer."   Thus, Section 251(h) requires equal payment: "[e]ach" share "that is the subject of" the tender offer must be either "accepted for purchase or exchange" or "converted" into "the same amount and kind of cash, property, rights or securities to be paid for shares of such class or series of stock . . . irrevocably accepted for purchase or exchange in such offer."   This equal payment requirement applied to Plaintiffs' Company Common Stock.

91.     Nuvei caused Merger Sub to commence the offer on January 24, 2023, by filing a tender offer statement on Schedule TO with the SEC.   A true and correct copy of the Offer is attached hereto as Exhibit 4 and is incorporated herein by reference.

92.     Consistent with the Merger Agreement, the Offer states that the offer to purchase Paya's common stock is open to "any and all of the issued and outstanding shares of common stock."   This included Plaintiffs' Company Common Stock.

93.     Section 15 of the Offer to Purchase sets forth the terms and conditions of Defendants' Tender Offer, none of which exclude Plaintiffs' Company Common Stock from the Tender Offer.   They include the following:

- the Minimum Condition has been satisfied;

- the HSR Condition has been satisfied;

- no governmental authority of competent jurisdiction has enacted, issued, promulgated, enforced or entered (and continuing in effect) any federal, state, local, foreign or multinational law, judgment, rule or regulation or order, or injunction, whether civil or administrative (whether temporary, preliminary or permanent) that prohibits, restricts, enjoins or otherwise makes illegal the consummation of the Offer or the Merger;

- (i) the representations and warranties set forth in Section 3.11(b) of the Merger Agreement shall be true and correct in all respects as of the Offer Expiration Time as if made at and as of the Offer Expiration Time; (ii) the representations and warranties set forth in Section 3.6(a), Section 3.6(b), Section 3.6(d), Section 3.6(e)(iii) and Section 3.6(g) shall be true and correct in all respects, except for any de minimis inaccuracies, as of the Offer Expiration Time as if made at and as of the Offer Expiration Time (except to the extent that any such representation and warranty expressly relates to an earlier date, in which case such representation and warranty shall be true and correct in all respects, except for any de minimis inaccuracies, as of such earlier date); (iii) the representations and warranties set forth in Section 3.1(a), Section 3.2, Section 3.3, Section 3.4(a)(i), Section 3.6(c), Section 3.6(e)(i), (ii) and (iv), Section 3.7(b) (with respect to any material subsidiaries), Section 3.7(c) (with respect to any material subsidiaries) and Section 3.28 of the Merger Agreement: (A) to the extent not qualified or limited by the word "material," "materiality" or "Company Material Adverse Effect" as set forth in the Merger Agreement, shall be true and correct in all material respects as of the Offer Expiration Time as if made at and as of the Offer Expiration Time (except to the extent that any such representation and warranty expressly relates to an earlier date, in which case such

representation and warranty shall be true and correct in all material respects as of such earlier date); and (B) to the extent qualified or limited by the word "material," "materiality" or "Company Material Adverse Effect" as set forth therein, shall be true and correct in all respects (giving effect to any limitation or qualification that includes the word "material," "materiality" or "Company Material Adverse Effect" set forth therein) as of the Offer Expiration Time as if made at and as of the Offer Expiration Time (except to the extent that any such representation and warranty expressly relates to an earlier date, in which case such representation and warranty shall be true and correct in all respects (giving effect to any limitation or qualification that includes the word "material," "materiality" or "Company Material Adverse Effect" set forth therein) as of such earlier date), and (iv) other than the representations and warranties expressly referenced in the foregoing clauses (i), (ii) and (iii), the other representations and warranties set forth in Article III of the Merger Agreement shall be true and correct (without giving effect to any limitation or qualification that includes the word "material," "materiality" or "Company Material Adverse Effect" set forth therein) as of the Offer Expiration Time as if made at and as of the Offer Expiration Time (except to the extent that any such representation and warranty expressly relate to an earlier date, in which case such representation and warranty shall be true and correct (without giving effect to any limitation or qualification that includes the word "material," "materiality" or "Company Material Adverse Effect" set forth therein) as of such earlier date), except in the case of this clause (iv) to the extent that the failure of such representations and warranties to be true and correct, individually or in the aggregate, has not had, and would not reasonably be expected to have, a Company Material Adverse Effect (the "Company Representations Condition");

- the Company shall have performed and complied in all material respects with the covenants, obligations and agreements in the Merger Agreement required to be performed and complied with by it at or prior to the Offer Expiration Time (the "Obligations Condition");

- since January 8, 2023, there has not been any fact, change, event, development, occurrence or effect that has had, or would reasonably be expected to have, a Company Material Adverse Effect that is continuing (the "Material Adverse Effect Condition");

- Parent and Purchaser shall have received a certificate of the Company, validly executed for and on behalf of the Company signed by an authorized executive officer of the Company, dated as of the date on which the Acceptance Time occurs, certifying that the conditions set forth in Company Representation Condition, the Obligation Condition and Material Adverse Effect Condition have been satisfied;

- the Termination Condition has been satisfied; and

- the Inside Date Condition has been satisfied.

94.     The Offer, however, purported to further subject its terms to certain additional terms and conditions, set forth in the Letter of Transmittal, that go beyond those set forth in the Merger Agreement.  In particular, the Letter of Transmittal required a tendering stockholder to "represent[] and warrant[] that the undersigned has full power and authority to tender, sell, assign and transfer any and all of the Shares tendered hereby (and any and all Distributions) and that, when the same are accepted for payment by Purchaser, Purchaser will acquire good and unencumbered title to such Shares (and such Distributions), **free and clear of all liens, restrictions,**

**charges and encumbrances and the same will not be subject to any adverse claims.**"

95.     The preceding language from the Letter of Transmittal does not exclude Plaintiffs' Company Common Stock.  Nor would it make sense for it to do so, given that the shares are being tendered to Nuvei, and there is no restriction on Nuvei's ability to acquire clear title or pay for them.  Paya is also a party to the Merger Agreement, and had the ability to waive any restrictions on the shares in connection with the Merger.

96.     To the extent the Letter of Transmittal (or any other document) can be read to exclude Plaintiffs' Company Common Stock from the Offer, it is illegal and void under Federal law.  The SEC has made clear that a tender offer cannot exclude restricted shares because doing so would violate "Rule 14d-10 or Rule 13e-4(f)(8)(i), which requires a tender offer to be open to all security holders of the class of the securities subject to the tender offer."[3]

97.     Each Plaintiff timely and validly tendered their Plaintiffs' Company Common Stock in response to the Offer, but Nuvei or its agent rejected those tenders.

98.     On February 22, 2023, Continental Stock Transfer & Trust Company ("Continental"), as depositary for the Offer, rejected Plaintiffs' tenders via email

---

[3]     https://www.sec.gov/divisions/corpfin/guidance/cdi-tender-offers-and-schedules (last updated 3/17/23)

stating that "because your Shares were not tendered free and clear of all liens, restrictions, charges and encumbrances and not subject to any adverse claims.   As set forth in the Letter of Transmittal, Purchaser agreed only to accept for payment and acquire Shares for which good and unencumbered title was tendered and available to be acquired by Purchaser, free and clear of all liens, restrictions, charges and encumbrances and not subject to any adverse claims."   A true and correct copy of Continental's email is attached hereto as Exhibit 5 and incorporated herein by reference.

99.    Nuvei has not paid Plaintiffs the $9.75 per share merger consideration for their Plaintiffs' Company Common Stock, yet accepted tenders for the other common shares of Paya and paid $9.75 per share for them.

100.   The Transaction closed on February 22, 2023.

## FIRST CLAIM FOR RELIEF

**(For Violation of Section 14(d) of the Exchange Act, 15 U.S.C. § 78n(d), and SEC Rule 14D-10(a)(1) Promulgated Thereunder, the "All-Holder Rule")**

101.   Plaintiffs restate and reallege the foregoing allegations as if fully set forth herein.

102.   Plaintiffs' Company Common Stock was registered with the SEC and purchases and sales of those securities, including tender offers for those securities, are subject to the provisions of the Exchange Act and rules and regulations of the SEC promulgated thereunder.

103.   SEC Rule 14D-10(a) provides that "No bidder shall make a tender offer unless:  (1) The tender offer is open to all security holders of the class of securities subject to the tender offer. . . ."  This is known as the "All-Holder Rule."

104.   The All-Holder Rule requires tender offers to be open to all holders of the same class of securities, regardless of whether the shares are restricted.  The SEC's official position in response to the question that "In a tender offer subject to Regulation 14D or Rule 13e-4, can a bidder or issuer exclude a security holder from participating in a tender offer because they hold restricted securities?" is that "No.  Such an exclusion would not be permitted under Rule 14d-10 or Rule 13e-4(f)(8)(i), which requires a tender offer to be open to all security holders of the class of the securities subject to the tender offer."[4]

105.   Similarly, the Staff of the SEC has stated that "[a] shareholder possessing restricted shares is not prohibited from tendering the shares pursuant to a tender offer merely because the shares are restricted."  SEC Division of Corporation Finance Manual of Publicly Available Telephone Interpretations, § Q, Question 9 (July 1997).  Instead, it is the bidder, here Defendants, who must "accept[] the shares subject to such restrictions."  *Id.*

---

[4]   https://www.sec.gov/divisions/corpfin/guidance/cdi-tender-offers-and-schedules (last updated 3/17/23)

106.  By refusing to accept Plaintiffs' tender of Plaintiffs' Company Common Stock, while accepting tenders by other holders of the same class of securities, Defendants violated SEC Rule 14D-10(a).

107.  Plaintiffs have suffered significant damages as a consequence of Defendants' unlawful conduct.

## SECOND CLAIM FOR RELIEF

## (For violation of Section 14(d) of the Exchange Act, 15 U.S.C. § 78n(d), and SEC Rule 14D-10(a)(2) Promulgated Thereunder, the "Best Price Rule")

108.  Plaintiffs restate and reallege the foregoing allegations as if fully set forth herein.

109.  Plaintiffs' Company Common Stock was registered with the SEC and purchases and sales of those securities, including tender offers for those securities, are subject to the provisions of the Exchange Act and rules and regulations of the SEC promulgated thereunder.

110.  SEC Rule 14D-10(a) provides that "No bidder shall make a tender offer unless: . . . (2) The consideration paid to any security holder for securities tendered in the tender offer is the highest consideration paid to any other security holder for securities tendered in the tender offer."  This is known as the "Best Price Rule."

111.  Defendants violated SEC Rule 14D-10(a) by paying $0 per share for Plaintiffs' Company Common Stock and $9.75 per share for the other common shares of Paya.

**112.** Plaintiffs have suffered significant damages as a consequence of Defendants' unlawful conduct.

## THIRD CLAIM FOR RELIEF

### (For Violation of 8 *Del. C.* § 251(h))

113.    Plaintiffs restate and reallege the foregoing allegations as if fully set forth herein.

114.    Defendants structured the Transaction as a tender offer pursuant to Section 251(h) of the DGCL.

115.    Section 251(h)(2) required that Defendants make the Tender Offer open to "all of the outstanding stock of such constituent corporation on the terms provided in such agreement of merger that, absent this subsection, would be entitled to vote on the adoption or rejection of the agreement of merger; provided, however, that such offer may be conditioned on the tender of a minimum number or percentage of shares of the stock of such constituent corporation, or of any class or series thereof, and such offer may exclude any excluded stock and provided further that the corporation may consummate separate offers for separate classes or series of the stock of such constituent corporation."

116.    All of Plaintiffs' Company Common Stock had voting rights.  Section 2.1(ii)(4) of the Sponsor Support Agreement Provides that: "Subject to Section 1.11,

Holders of [Plaintiffs' Company Common Stock] shall be entitled to vote such [Plaintiffs' Company Common Stock] . . ."

117.   The voting restriction of Section 1.11 of the Sponsor Support Agreement terminated after the closing of the Fintech Transaction and had no further force or effect.  Therefore, absent Section 251(h) of the DGCL, each of Plaintiffs' Company Common Stock shares would be entitled to vote on the adoption or rejection of the Merger, and Section 251(h)(2) required Defendants to include Plaintiffs' Company Common Stock in the Tender Offer.

118.   By refusing to accept Plaintiffs' tender of shares and/or not agreeing to pay $9.75 per share for Plaintiffs' Company Common Stock, Defendants violated Section 251(h)(2) of the DGCL.

119.   In addition, Section 251(h)(5) of the DGCL provides that "[e]ach outstanding share (other than shares of excluded stock) of each class or series of stock of such constituent corporation that is the subject of and is not irrevocably accepted for purchase or exchange in the offer referred to in paragraph (h)(2) of this section is to be converted in such merger into, or into the right to receive, the same amount and kind of cash, property, rights or securities to be paid for shares of such class or series of stock of such constituent corporation irrevocably accepted for purchase or exchange in such offer."

120.   Because Defendants did not pay $9.75 for Plaintiffs' Company Common Stock, while paying $9.75 per share for the other common shares of Paya, they violated Section 251(h)(5) of the DGCL.

121.   Plaintiffs have suffered significant damages as a consequence of Defendants' unlawful conduct.

## FOURTH CLAIM FOR RELIEF

### (Breach of the Merger Agreement For Failure To Pay $9.75 Per Share For Plaintiffs' Company Common Stock)

122.   Plaintiffs restate and reallege the foregoing allegations as if fully set forth herein.

123.   Plaintiffs have standing as third-party beneficiaries to enforce their right to receive the $9.75 per share consideration under the Merger Agreement pursuant to Section 9.5 of the Merger Agreement, which provides in relevant part: "[t]his Agreement is not intended to and shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns, **except** . . . (b) if the Offer Acceptance Time occurs, (A) **for the right of the holders of Company Common Stock to receive the Per Share Price or the Merger Consideration**, as applicable, following the Offer Acceptance Time or the Effective Time, as applicable, in accordance with Article II")."

124.   Section 2.1(a) of the Merger Agreement, titled "Commencement of the Offer" required [Nuvei] to cause Merger Sub to "commence (within the meaning of

Rule 14d-2 promulgated under the Exchange Act) the Offer to purchase **all of the outstanding shares of Company Common Stock** (other than Owned Company Shares) at a price per share of the Company Common Stock equal to the Per Share price to the holder of the share of Company Common Stock, without interest thereon (but subject to applicable withholding)."

125.   Section 2.1(b) of the Merger Agreement, titled "Terms and Conditions of the Offer" provides in relevant part that:  "[t]he obligations of Merger Sub to, and of Parent to cause Merger Sub to, accept for payment, and pay for, any shares of Company Common Stock validly tendered (and not validly withdrawn) pursuant to the Offer are subject **only** to the terms and conditions set forth in this Agreement."

126.   Plaintiffs' Company Common Stock is common stock as described in the Merger Agreement and has a contractual right to receive $9.75 per share if Plaintiffs tendered their shares and/or Defendants completed the Merger.

127.   None of the terms and conditions of the Merger Agreement permitted Defendants to fail to pay Plaintiffs $9.75 per share for their Plaintiffs' Company Common Stock.

128.   Defendants breached the Merger Agreement by failing to accept Plaintiffs' tender of Plaintiffs' Company Common Stock and/or pay $9.75 per share for those shares.

129.    Plaintiffs have suffered significant damages as a consequence of Defendants' unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

(A)    declaring that Defendants have violated Section 14(d) of the Exchange Act and Rules 14d-10(a)(1) and 14d-10(a)(2) promulgated thereunder;

(B)    declaring that Defendants have violated Section 251(h) of the DGCL;

(C)    declaring that Defendants breached the Merger Agreement;

(D)    awarding compensatory damages, including consequential damages, in amounts to be provided by Plaintiffs;

(E)     awarding such other and further relief as this Court may deem just and proper; and

(F)    ordering payment for the benefit of Plaintiffs of the costs of this action, including the reasonable fees and expenses of their undersigned attorneys and counsel.

Dated: September 1, 2023

/s/ Derrick Farrell
Derrick B. Farrell (#5747)
**Bleichmar Fonti & Auld LLP**
3411 Silverside Rd.
Baynard Building, Ste. 104
Wilmington, Delaware 19810
T:  302-499-2158
F:  302-691-1331
dfarrell@bfalaw.com

*Counsel for Plaintiffs*

Of Counsel:

Javier Bleichmar
Evan A. Kubota
**Bleichmar Fonti & Auld LLP**
Times Square Tower
7 Times Square, 27th Floor
New York, NY 10036
T: 212-789-1340