**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| ABRAMOWSKI et al.,<br><br>          Plaintiffs,<br><br>    - against -<br><br>NUVEI CORPORATION and PINNACLE<br>MERGER SUB, INC.,<br><br>          Defendants. | C.A. No. 1:23-cv-965-GBW |

**DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR
<u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

*Of Counsel*

DAVIS POLK & WARDWELL LLP
Brian M. Burnovski
Matthew Cormack
Chui-Lai Cheung
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000

MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
Kevin M. Coen (#4775)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
kcoen@morrisnichols.com
(302) 351-9301
    *Attorneys for Defendants Nuvei
    Corporation and Pinnacle Merger Sub,
    Inc.*

Dated: November 15, 2023

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................................................................. ii

NATURE AND STAGE OF PROCEEDINGS ...................................................................... 1

SUMMARY OF ARGUMENT ............................................................................................. 1

STATEMENT OF FACTS ..................................................................................................... 3

    A.  The SPAC IPO ..................................................................................................... 3

    B.  The Paya de-SPAC Transaction ......................................................................... 3

    C.  The Two-Step Merger ......................................................................................... 6

LEGAL STANDARD ........................................................................................................... 10

ARGUMENT ......................................................................................................................... 10

I.   In Full Compliance with the Merger Agreement, Nuvei Accepted Only Shares
That Were Owned by Tendering Shareholders and Validly Tendered in the Offer ............. 10

    A.  Plaintiffs' Earnout Shares Were Forfeited by Their Terms Prior to Nuvei's
Acceptance of Any Shares in the Offer ............................................................... 10

    B.  Plaintiffs' Earnout Shares Were Ineligible To Be Tendered ............................... 11

II.  Nuvei's Offer Complied With Section 14(d) of the Exchange Act ................................... 14

    A.  Plaintiffs Fail to Plead a Violation of the All Holders Rule ................................ 15

        1.  Earnout Shares Were Forfeited and Therefore Not Subject to
Acceptance by Nuvei ................................................................................ 15

        2.  Earnout Shares Were Not "of the Same Class" as General Common Stock ........... 16

        3.  The All Holders Rule Separately Allows the Exclusion of
Encumbered Shares Like the Earnout Shares ......................................... 17

    B.  Plaintiffs' Claim Under the Best Price Rule Fails .............................................. 18

III. Plaintiffs' Claim Under Delaware General Corporation Law Section 251(h) Fails ............. 19

CONCLUSION ...................................................................................................................... 20

i

# TABLE OF AUTHORITIES

PAGE

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................................. 10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................................. 10

*Buck v. Hampton Twp. Sch. Dist.*,
452 F.3d 256 (3d Cir. 2006) ................................................................................................. 3

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ............................................................................................................. 14

*In re Google Inc.*,
806 F.3d 125 (3d Cir. 2015) ............................................................................................... 10

*J.I. Case Co. v. Borak*,
377 U.S. 426 (1964) ............................................................................................................. 14

*Loper Bright Enters. v. Raimondo*,
143 S. Ct. 2429 (2023) ........................................................................................................ 14

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
293 F. Supp. 2d 224 (E.D.N.Y. 2003) ................................................................................. 19

*Polaroid Corp. v. Disney*,
862 F.2d 987 (3d Cir. 1988) ......................................................................................... 14, 16

*Relentless Inc. v. Dep't of Commerce*,
No. 22-1219 (2023) .............................................................................................................. 14

*Schmidt v. Skolas*,
770 F.3d 241 (3d Cir. 2014) ................................................................................................. 3

*Schreiber v. Burlington N., Inc.*,
472 U.S. 1 (1985) ................................................................................................................. 14

*Sedighim v. Donaldson, Lufkin & Jenrette, Inc.*,
167 F. Supp. 2d 639 (S.D.N.Y. 2001) ....................................................................... 2, 16, 18

*In re Volcano Corp. Stockholder Litig.*,
143 A.3d 727 (Del. Ch. Ct. 2016) ....................................................................................... 20

*W. Penn Allegheny Health Sys. v. UPMC*,
627 F.3d 85 (3d Cir. 2010) ................................................................................................... 3

*In re WHX*, Exchange Act Release No. 47980,
    2003 WL 21283081 (June 4, 2003),
    *overruled on other grounds by WHX Corp. v. SEC*, 362 F.3d 854 (D.C. Cir. 2004) ........ 17, 18

*Ziglar v. Abbasi*,
    137 S. Ct. 1843 (2017) ........................................................................................... 14

## STATUTES & RULES

8 Del. Code § 251(h) ..................................................................................... *passim*
8 Del. Code § 251(h)(2) ...................................................................................... 20
15 U.S.C. § 78l(g)(5) ......................................................................................... 16
17 C.F.R. § 230.144(a)(3) .................................................................................. 18
17 C.F.R. § 240.14d-10(a) ................................................................................. 14
17 C.F.R. § 240.14d-10(a)(1) ............................................................................. 15
17 C.F.R. § 240.14d-10(a)(2) ......................................................................... 18, 19
Fed. R. Civ. P. 12(b)(6) .................................................................................. 1, 10
Section 14(d) of the Exchange Act ............................................................... 14, 15, 18

## OTHER AUTHORITIES

Amendments to Tender Offer Rules; All-Holders and Best Price,
    51 Fed. Reg. 25,873 (July 17, 1986) .............................................................. 16, 19

*Full*, Merriam-Webster Online,
    https://www.merriam-webster.com/dictionary/full (last visited Nov. 15, 2023) ................... 13

Jessica Bai, Angela Ma & Miles Zheng, *Segmented Going-Public Markets and the
    Demand for SPACs* (June 2023),
    https://ssrn.com/abstract=3746490 ................................................................... 4

Thomas Lee Hazen, Treatise on the Law of Securities Regulation,
    3 Law Sec. Reg. § 11:21 (June 2023) ................................................................. 14

*Valid*, Merriam-Webster Online,
    https://www.merriam-webster.com/dictionary/valid (last visited Nov. 15, 2023) ............ 11, 12

## NATURE AND STAGE OF PROCEEDINGS

On September 1, 2023, Plaintiffs filed a complaint asserting four causes of action against Defendants Nuvei Corporation and Pinnacle Merger Sub, Inc. (together, "Nuvei" or "Defendants") arising out of Nuvei's acquisition of Paya Holdings, Inc. ("Paya"). Plaintiffs allege that Defendants breached the merger agreement and violated federal and state law by refusing to purchase Plaintiffs' shares in a tender offer undertaken as the first step in the merger transaction. On September 26, 2023, Plaintiffs amended their complaint to include an additional plaintiff. Defendants hereby move the Court to dismiss the Amended Complaint ("AC") in its entirety under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## SUMMARY OF ARGUMENT

Plaintiffs were holders of Paya equity issued as a form of incentive compensation, which were referred to as "Earnout Shares." The agreement governing those shares provided that, in a change of control of Paya, the shares would have value only if they were purchased for a share price of $15.00 or more. If Paya equity were to be purchased for less than that, the shares would be forfeited immediately prior to the change of control. Here, Nuvei purchased Paya for $9.75 per share in a two-step merger, as contemplated by Section 251(h) of the Delaware General Corporation Law ("DGCL"). That was well below the $15.00 per share threshold, and thus, the Earnout Shares were automatically forfeited prior to the transaction. Plaintiffs' lawsuit is nothing more than a brazen attempt to obtain an improper windfall for equity that they had agreed, under the circumstances, would have no value. Their gambit is meritless, and the Amended Complaint should be dismissed.

*First*, the merger agreement between Nuvei and Paya obligated Nuvei to accept in the tender offer shares that were "validly tendered." That is what Nuvei did. Plaintiffs complain that Nuvei improperly refused to accept their shares, but only the Earnout Shares were not

accepted. Nuvei could not have accepted those shares because, pursuant to the express terms of a Sponsor Support Agreement that governed the shares (D.I. 1-2), Plaintiffs forfeited the Earnout Shares immediately prior to Nuvei's acceptance of shares validly tendered in the offer. Nor could Plaintiffs have validly tendered the Earnout Shares in the first place. Pursuant to the Sponsor Support Agreement, not only were the shares subject to forfeiture, but they were also subject to various restrictions that precluded their tender. Accordingly, it was clear at the time of tender that, among other things, Plaintiffs lacked "full power and authority to . . . sell, assign and transfer" the Earnout Shares and distributions made thereon, "free and clear" of all restrictions, as required to validly tender under the terms of the offer.

*Second*, contrary to Plaintiffs' contentions, neither the All Holders Rule nor the Best Price Rule required Nuvei to purchase the Earnout Shares, notwithstanding that those shares were automatically forfeited prior to acceptance, nor does either Rule give Plaintiffs the right to receive a windfall that would contravene the terms of the bargain they struck. The All Holders Rule is intended "to ensure equal treatment in a tender offer for all similarly situated investors," and it "should not be parsed so finely" if doing so, as here, "would yield an absurd result." *Sedighim v. Donaldson, Lufkin & Jenrette, Inc.*, 167 F. Supp. 2d 639, 651 (S.D.N.Y. 2001). Nothing in the All Holders Rule displaces Plaintiffs' contractual agreement that their Earnout Shares would be forfeited in a change in control transaction below $15.00 per share. For the same reason, the Best Price Rule is inapplicable.

*Third*, Plaintiffs' reliance on DGCL Section 251(h) is unavailing. That statute simply codifies the two-step merger process; it does not mandate the purchase of out-of-the-money incentive shares that were automatically forfeited by their terms, prior to the acceptance of any shares. The statute requires that a tender offer be open to all stock eligible to vote, but it does not

2

displace the well-established ability of an offeror to decline to purchase certain stock if it fails to meet the requirements of the tender offer.  To hold otherwise would upend the tender process and provide an unfair windfall to holders of incentive equity in a company that failed to meet the financial benchmarks necessary to obtain their full value.

**STATEMENT OF FACTS**[1]

### A.    The SPAC IPO

Plaintiffs Betsy H. Cohen, Daniel Cohen, and their investment vehicles FinTech Investor Holdings III, LLC, 3FIII, LLC, and FinTech Masala Advisors, LLC (collectively, the "Sponsors") created and took public a special purpose acquisition company ("SPAC"), named Fintech Acquisition Corp. III.  *See* AC ¶¶ 75-76.  The SPAC's stated goal was to identify a private operating company to acquire through a merger or other business combination—a so-called de-SPAC transaction—which would allow the private operating company to itself become public.  AC ¶ 75; s*ee* Ex. 1 (FinTech Acquisition Corp. III, Form S-1 (Oct. 23, 2018)) at 2.  In connection with the initial public offering of Fintech Acquisition Corp. III, the Sponsors obtained significant equity, commonly referred to as "founder shares" or "promote shares," for a nominal purchase price.  *See id.* at 44, 107, F-12.

### B.    The Paya de-SPAC Transaction

On August 3, 2020, entities affiliated with the Sponsors entered into a merger agreement (the "FinTech Merger Agreement") to take Paya public through a de-SPAC transaction.  AC

---

[1] Solely for purposes of this motion, Nuvei assumes the facts alleged in the Amended Complaint are true.  In addition to any well-pled allegations in the Amended Complaint, the Court may consider on a motion to dismiss any exhibits attached to or incorporated by reference in the complaint or in documents cited therein.  *See, e.g.*, *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006); *W. Penn Allegheny Health Sys., Inc. v. Univ. Penn. Med. Ctr.*, 627 F.3d 85, 102-03 (3d Cir. 2010).  Finally, the Court may consider "matters of public record" as to which judicial notice may be taken, such as filings with the SEC.  *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

¶ 75. After the de-SPAC transaction, the shell company was dissolved, and Paya continued its operations as a publicly traded company. *Id.*

Contemporaneously with the execution of the FinTech Merger Agreement, the Sponsors entered into the Sponsor Support Agreement in which they agreed to take certain actions in support of the merger, including investing additional equity. D.I. 1-2 (Sponsor Support Agreement) §§ 1.09-1.11. The Sponsor Support Agreement also provided that a specified number of the preexisting promote shares would be converted to Earnout Shares, which would be subject to certain restrictions designed to further align the financial incentives of the Sponsors and Paya's other stockholders. *Id.* §§ 2.1, 2.2.[2] Those Earnout Shares, which are subject to the restrictions specified in the Sponsor Support Agreement, are the shares at issue in this litigation. *See* AC ¶ 13 ("Each of the Plaintiffs held shares of Paya common stock, *subject to certain restrictions* ('Plaintiffs' Company Common Stock') . . . ."); *id*. ¶ 77 ("The Sponsor Support Agreement and FinTech Merger Agreement *set out certain restrictions* on Plaintiffs' Company Common Stock." (emphasis added)).[3]

Among other things, the Sponsor Support Agreement provided that, until the restrictions were lifted (as described further *infra* at 5-6), all dividends and other distributions would be set aside by Paya and would not be payable to the holders of the Earnout Shares. D.I. 1-2 § 2.2(ii)(4). Further, except for transfers to certain "Permitted Transferees," "[n]o holder of

---

[2] *See generally* Jessica Bai, Angela Ma & Miles Zheng, *Segmented Going-Public Markets and the Demand for SPACs* at 7 (June 2023), https://ssrn.com/abstract=3746490 (describing use of earnout provisions, which are "based on more long-run performance of the operating firms," in sponsor compensation structure "in order to align SPAC sponsors with long-term shareholders").

[3] In total, the Sponsor Support Agreement created 5,681,812 Earnout Shares. *See* D.I. 1-2 sch I. Plaintiffs purportedly attempted to tender 5,170,771 of these shares. *See* AC ¶¶ 14-70.

Earnout Shares shall Transfer any Earnout Shares during the Earnout Period [i.e., from October 16, 2020 to October 16, 2025] to the extent such Earnout Shares are subject to restrictions at the time of the contemplated Transfer." *Id.* § 2.2(iii).[4]  And even with respect to Permitted Transferees, transfer was permitted only "so long as such Permitted Transferee agree[d] in writing to be subject to the [restrictions in the Sponsor Support Agreement]." *Id.* § 2.2(iii). After transfer to a Permitted Transferee, the Earnout Shares would "continue to be Earnout Shares"—i.e., subject to all the same restrictions. *Id.* § 2.1.

As set forth in the Sponsor Support Agreement, the restrictions were to be lifted if, and only if, Paya common stock traded above a certain price, or if there were a change of control transaction at a price exceeding that price. *See id.* § 2.2; *see also* AC ¶ 77.  Section 2.2(i) of the agreement provided that 50% of the Earnout Shares would become free of restrictions if Paya common stock traded at $15.00 per share "for any period of 20 trading days out of 30 consecutive trading days" and another 50% if the stock traded above $17.50 per share for such period.  D.I. 1-2 § 2.2(i)(1)-(2).  Section 2.2(ii) provided that the lifting of the restrictions would be accelerated "[u]pon the first Change in Control to occur during the Earnout Period" for 50% of the Earnout Shares if the price paid per share in connection with the Change in Control was between $15.00 and $17.50, and for 100% of the Earnout Shares if the price paid per share was equal to or more than $17.50.  *Id.* §§ 2.2(ii)(1)-(2).  A "Change in Control," as defined in the

---

[4] The Sponsor Support Agreement provides that capitalized terms used but not otherwise defined therein have the meanings in the FinTech Merger Agreement. D.I. 1-2 at 1.  The FinTech Merger Agreement, in turn, defined the Earnout Period as the period "[f]rom and after the Closing [of the de-SPAC transaction] until the fifth anniversary of the Closing Date"—i.e., from October 16, 2020 to October 16, 2025.  D.I. 1-1 (FinTech Merger Agreement) § 4.05(a). The Sponsor Support Agreement defined the term "Transfer" broadly, *see* D.I. 1-2 § 1.2, while defining the term "Permitted Transferee" by reference to a letter agreement entered into in connection with the initial public offering of FinTech Acquisition Corp. III, *see id.* § 2.2.(iii); D.I. 1-3 (Letter Agreement) ¶ 3(d).

FinTech Merger Agreement and incorporated into the Sponsor Support Agreement, included any person "acquiring ownership of equity securities of [Paya] which, together with the equity securities held by such Person, such Person and its Affiliates or such group, constitutes more than 50% of the total voting power or economic rights of the equity securities of [Paya]." D.I. 1-1 at 6; D.I. 1-2 at 1 (incorporating the FinTech Merger Agreement's definition of capitalized terms, including "Change in Control").

Conversely, and critically, the Sponsor Support Agreement provided that, in the event of a Change of Control during the Earnout Period where the per share price paid in connection therewith did not meet the threshold Minimum Target amount of $15.00, "none of the Earnout Shares subject to transfer restrictions shall become free of transfer restrictions pursuant to this Section 2.2(ii) and *all of the Earnout Shares shall be automatically forfeited immediately prior to the consummation of such Change of Control*." D.I. 1-2 § 2.2(ii)(3) (emphasis added). In other words, the Sponsors expressly agreed that in the event Paya were acquired for less than $15.00 per share, the Earnout Shares would be forfeited entirely and the Sponsors and/or their Permitted Transferees would not be entitled to any payment whatsoever for those shares.

### C.    The Two-Step Merger

In 2021, Paya began exploring a potential sale of the company and contacted potential buyers, including Nuvei, a Canadian payment technology company. AC ¶ 82. On January 8, 2023, Nuvei and Paya entered into an agreement and plan of merger (the "Merger Agreement"), whereby Nuvei, through its wholly owned subsidiary Pinnacle Merger Sub, Inc. ("Merger Sub"), agreed to acquire Paya at a price of $9.75 per share, in a two-step merger pursuant to DGCL Section 251(h). *Id.* ¶¶ 83, 85. Section 251(h) permits a corporation to effectuate a merger without requiring a separate shareholder vote to authorize the merger where the corporation first "consummates an offer for all of the outstanding stock" of the target corporation. 8 *Del. C.*

6

§ 251(h).  If the acquiring corporation successfully consummates the tender offer and "irrevocably accept[s] for purchase" stock in the offer that, together with other stock owned by the acquirer, equals a majority of shares entitled to vote on the merger agreement, the acquirer may merge with the target corporation without the need for a separate shareholder vote.  *Id.*

The Merger Agreement provided that Nuvei would commence a tender offer to purchase in cash, "all of the issued and outstanding shares of common stock" of Paya "at a price of $9.75 per Share," subject to the terms and conditions in the agreement (the "Offer").  D.I. 1-4 at 1; *see* Ex. 2 (Nuvei Merger Agreement) at 1.  The Merger Agreement provided that the Offer would "be made by means of an offer to purchase (the 'Offer to Purchase')" and required Nuvei to file with the SEC a statement that "shall contain or incorporate by reference the Offer to Purchase and the form of the related letter of transmittal, summary advertisement, if any, and other customary ancillary offer documents pursuant to which the Offer will be made."  *Id*. §§ 2.1(b), 2.1(f).  The Merger Agreement expressly stated that "5,681,812 [shares of stock] are subject to earnout and forfeiture in accordance with the terms of the [Sponsor] Support Agreement."  *Id*. § 3.6(a).

On January 24, 2023, Nuvei commenced the Offer by filing the Offer to Purchase with the SEC on Schedule TO, which stated that the Offer was made "upon the terms and subject to the conditions set forth in [the Offer to Purchase] and in the related Letter of Transmittal" (the "Letter of Transmittal") (D.I. 1-4 at 1), as expressly required under the terms of the Merger Agreement (Ex. 2 § 2.8(b)).  As set forth in the Offer to Purchase, Merger Sub offered to purchase, "subject to certain conditions, including the satisfaction of the Minimum Condition . . . , any and all of the issued and outstanding shares" of Paya common stock for $9.75 per share, "upon the terms and subject to the conditions set forth in this Offer to Purchase (the 'Offer to Purchase') and in the related Letter of Transmittal (the 'Letter of Transmittal' and which,

7

together with this Offer to Purchase and other related materials, as each may be amended or supplemented from time to time, constitutes the 'Offer')." D.I. 1-4 at 1.[5]

Under the terms of the Offer, and consistent with the Merger Agreement, Nuvei agreed to "irrevocably accept for payment all Shares *validly tendered* and not validly withdrawn prior to the Offer Expiration Time," defined as "one minute following 11:59 p.m., New York City time, on Tuesday, February 21, 2023" (the "Offer Expiration Time"). *Id.* § 1 (emphasis added). The Offer to Purchase stated that, "[f]or purposes of the Offer, if and when Purchaser gives oral or written notice to the Depositary of its acceptance for payment of such Shares pursuant to the Offer, then Purchaser has accepted for payment and thereby purchased Shares validly tendered and not properly withdrawn pursuant to the Offer." *Id.* § 2. The "date and time" of Nuvei's acceptance for payment of shares—which corresponded to the consummation of the Change in Control—was referred to as the "Acceptance Time." *Id.*

Section 3 of the Offer to Purchase expressly required that to validly tender shares, shareholders must complete and execute the Letter of Transmittal before the Offer Expiration Time. *Id.* § 3. The Letter of Transmittal, in turn, required that tendering shareholders represent and warrant to the transferability of their shares:

> The undersigned hereby represents and warrants that the undersigned has *full power and authority to tender, sell, assign and transfer any and all of the Shares tendered hereby (and any and all Distributions) and that, when the same are accepted for payment by Purchaser, Purchaser will acquire good and unencumbered title to such Shares (and such Distributions), free and clear of all liens, restrictions, charges and encumbrances* and the same will not be subject to any adverse claims.

---

[5] The "Minimum Condition" required "that the number of Shares validly tendered (and not properly withdrawn) prior to the Offer Expiration Time . . . , together with any Shares owned by Parent, Purchaser or any of their affiliates, represents at least one more Share than 50% of the total number of Shares outstanding as of the consummation of the Offer at [the Offer Expiration Time]." D.I. 1-4 at ii.

Ex. 3 (Letter of Transmittal) at 4 (emphasis added).  As provided by the Letter of Transmittal, "effective upon acceptance for payment of the Shares tendered herewith," the tendering shareholders are to "sell[], assign[] and transfer[]" to Nuvei "all right, title and interest in and to all of the Shares that are being tendered hereby (and any and all dividends, distributions, rights, other Shares or other securities issued or issuable in respect thereof on or after the date hereof (collectively, 'Distributions'))."  *Id.* at 3.

Plaintiffs purport to have tendered their Earnout Shares in connection with the Offer.  *See* AC ¶¶ 13-70.  On February 22, 2023, the depositary agent informed certain Plaintiffs that their Earnout Shares "have not been accepted in the Offer, because [their] shares were not tendered free and clear of all liens, restrictions, charges and encumbrances and not subject to any adverse claims."  D.I. 1-5 (Feb. 22, 2023 Email from Continental Stock) at 1.  The notice reiterated that,

> As set forth in the Letter of Transmittal, Purchaser agreed only to accept for payment and acquire Shares for which good and unencumbered title was tendered and available to be acquired by Purchaser, free and clear of all liens, restrictions, charges and encumbrances and not subject to any adverse claims.

*Id.*  At "one minute following 11:59 p.m., New York City time, on Tuesday, February 21, 2023," Nuvei consummated the Offer.  Effective upon its acceptance for payment of the shares tendered in the Offer, Nuvei acquired a majority of Paya common stock outstanding (*see* D.I. 1-4 at 16-18), which constituted a Change in Control under the Sponsor Support Agreement (*see* D.I. 1-1 at 6; D.I. 1-2 at 1).  By operation of the forfeiture provisions in Section 2.2 of the Sponsor Support Agreement, the Earnout Shares were automatically forfeited "immediately ***prior to*** the consummation of [the] Change in Control" and the acceptance of any Paya shares validly tendered in response to the Offer.  D.I. 1-2 § 2.2(ii)(3) (emphasis added).

## LEGAL STANDARD

Rule 12(b)(6) mandates that a complaint must be dismissed if it lacks "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a court must "assum[e] that all the allegations in the complaint are true," *Twombly*, 550 U.S. at 555, allegations that are legal conclusions "are not entitled to the assumption of truth," *Iqbal*, 556 U.S. at 679. And the court "need not give legal effect to 'conclusory allegations' that are contradicted by the pleader's actual description of what happened." *In re Google Inc.*, 806 F.3d 125, 142 (3d Cir. 2015).

## ARGUMENT

**I.    In Full Compliance with the Merger Agreement, Nuvei Accepted Only Shares That Were Owned by Tendering Shareholders and Validly Tendered in the Offer**

Plaintiffs' claim for breach of the Merger Agreement is baseless. Nuvei did not accept Plaintiffs' Earnout Shares in connection with the Offer because under the terms of the Sponsor Support Agreement, those shares (i) were automatically forfeited immediately prior to Nuvei's acceptance of any shares validly tendered in the Offer and, thus, were not capable of being accepted; and (ii) were subject to restrictions that prevented them from being "validly tendered" in the first place. Nothing in the Merger Agreement, which stated that the Earnout Shares were subject to forfeiture, required a different result.

**A.    Plaintiffs' Earnout Shares Were Forfeited by Their Terms Prior to Nuvei's Acceptance of Any Shares in the Offer**

Plaintiffs allege that Nuvei breached the Merger Agreement by "failing to accept Plaintiffs' tender of Plaintiffs' Company Common Stock and/or pay $9.75 per share for those shares." AC ¶ 129. But pursuant to the Sponsor Support Agreement, Plaintiffs' Earnout Shares

10

were forfeited *before* Nuvei accepted any shares for purchase, and therefore Nuvei could not have purchased the Earnout Shares from Plaintiffs.

The Sponsor Support Agreement, which was binding on all recipients of the Earnout Shares, expressly provided that the Earnout Shares would be forfeited, and would be worthless, if there were a Change of Control where the price paid per share of Paya stock was less than $15.00. D.I. 1-2 § 2.2(ii)(3). Here, Nuvei offered to purchase Paya common stock at a share price of $9.75 (AC ¶ 85), well below the minimum threshold amount required to free any of Plaintiffs' Earnout Shares from their transfer restrictions (*see* D.I. 1-4 at ii).

Pursuant to the terms of the Offer, any validly tendered shares would be "s[old], assign[ed] and transfer[red]" to Nuvei "effective upon" Nuvei's "acceptance for payment of the Shares." Ex. 3 at 3. Accordingly, Nuvei and its affiliates gained control of Paya at the Acceptance Time, which was the first "Change of Control" in the Earnout Period, and the Earnout Shares were forfeited pursuant to the terms of the Sponsor Support Agreement "immediately *prior to*" Nuvei's acceptance of any shares for payment (D.I. 1-2 § 2.2(ii)(3)). Plaintiffs could not have sold their Earnout Shares to Nuvei, and Nuvei could not have bought those shares from Plaintiffs, because at the time of acceptance, the shares were forfeited and not owned by Plaintiffs. Nothing in the Merger Agreement obligated Nuvei to purchase shares that Plaintiffs did not own as of the Acceptance Time. That alone is fatal to Plaintiffs' claim.

### B.   Plaintiffs' Earnout Shares Were Ineligible To Be Tendered

Plaintiffs' claim fails for the additional reason that the Earnout Shares were not "validly tendered" in the first place, as required by the Merger Agreement. AC ¶ 126; Ex. 2 at 23; D.I. 1-4 at ii. At a minimum, to "validly tender" shares, the shareholder must have the legal authority to transfer those shares to Nuvei, such that Nuvei would be acquiring good and unencumbered title to those shares at the time of acceptance. *See Valid*, Merriam-Webster

11

Online, https://www.merriam-webster.com/dictionary/valid (last visited Nov. 15, 2023) (defining "valid" to mean "executed with the proper legal authority and formalities"). Here, however, it was clear that was impossible because, as explained above (*supra* at 4-9) and as Plaintiffs knew, pursuant to the terms of the Sponsor Support Agreement, the shares would have been forfeited prior to acceptance and were subject to restrictions that precluded their transfer. On that basis alone, Nuvei had no obligation under the Merger Agreement to purchase the Earnout Shares.

If there was any doubt about that conclusion, the invalidity of Plaintiffs' purported tender is confirmed by the requirements of the Letter of Transmittal, which was expressly contemplated by the Merger Agreement and which tendering shareholders were required to submit to tender their shares. D.I. 1-4 at 19. The Letter of Transmittal expressly required shareholders to "represent[] and warrant[]" both that they had "full power and authority to tender, sell, assign and transfer" not only the tendered shares, but also "any and all Distributions." Ex. 3 at 3. And the shareholders were also required to represent that when the shares "are accepted for payment by Purchaser, Purchaser will acquire good and unencumbered title to such Shares (and such Distributions), free and clear of all liens, restrictions, charges and encumbrances." *Id.* at 4. Plaintiffs could not make these fundamental and customary representations with respect to the Earnout Shares.

*First*, Plaintiffs lacked the "*full* power and authority to tender, sell, assign and transfer" the Earnout Shares because those shares could only be transferred in limited circumstances (*see supra* 4-5), and even then, only if the recipient of the Earnout Shares "agrees in writing to be subject to the [restrictions]" (D.I. 1-2 § 2.2(iii)). Plaintiffs did not have, and could not represent that they had, "*full* power" to "transfer" the Earnout Shares because their ability to transfer the shares was limited to certain parties and expressly conditioned on the willingness of that party to

12

agree to be bound by the Sponsor Support Agreement—a condition out of Plaintiffs' control. *See Full*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/full (last visited Nov. 15, 2023) (defining "full" to include "lacking restraint, check, or qualification"). Even if the word "full" were read out of the Letter of Transmittal, Plaintiffs still would not have been in a position to make the required representation here, as Plaintiffs surely did not have power to transfer the Earnout Shares to Nuvei: Plaintiffs do not, and could not, allege that they ever obtained any agreement in writing from Nuvei to be bound by the Sponsor Support Agreement, as would be required for any such transfer. Indeed, as alleged in the Amended Complaint, Nuvei expressly refused to accept the Earnout Shares at all. AC ¶¶ 98-99.

*Second*, Plaintiffs could not satisfy the representations required by the Letter of Transmittal that "when the [shares tendered] are accepted for payment by Purchaser, Purchaser will acquire good and unencumbered title to such Shares (and such Distributions), *free and clear of all liens, restrictions, charges and encumbrances*" (Ex. 3 at 4 (emphasis added)) because even assuming that Plaintiffs' Earnout Shares were not forfeited and could be transferred, they would have "continue[d] to be Earnout Shares" and subject to restrictions pursuant to the Sponsor Support Agreement (D.I. 1-2 at 6).

*Third*, Plaintiffs also could not "represent[] and warrant[]," as required by the Letter of Transmittal, that they had the "full power" to transfer "any and all Distributions" received on account of their Earnout Shares. Ex. 3 at 4. Under Section 2.2(ii)(4) of the Sponsor Support Agreement, any distributions on Plaintiffs' Earnout Shares were to be "set aside . . . and only be paid . . . upon the lifting of transfer restrictions from such Earnout Shares." D.I. 1-2 § 2.2(ii)(4). But for the reasons explained above (*supra* at 4-6), the transfer restrictions were never lifted

13

from Plaintiffs' Earnout Shares, and distributions on those shares remained set aside.  Plaintiffs thus did not have the required "full power and authority" to assign any distributions to Nuvei.

## II.     Nuvei's Offer Complied With Section 14(d) of the Exchange Act

Plaintiffs' claims under Section 14(d) of the Exchange Act and Rule 14D-10(a) must be dismissed for two independent reasons.[6]  First, as demonstrated above (*see supra* at 10-11), Plaintiffs' restricted Earnout Shares were forfeited immediately prior to the Acceptance Time, and thus, Plaintiff had no such shares for Nuvei to accept for purchase at that time.  Second, even if Plaintiffs' Earnout Shares had not been forfeited, the Offer was consistent with the All Holders

---

[6] Even if Plaintiffs had adequately pled violations of the All Holders Rule and the Best Price Rule (which they have not), both Rules are invalid because they are "beyond the SEC's authority under the Williams Act, for [their] purpose seems to be neither to ensure full disclosure nor to provide for an adequate time period for investors to comprehend disclosed information," *Polaroid Corp. v. Disney*, 862 F.2d 987, 994-95 (3d Cir. 1988) (citing *Schreiber v. Burlington N., Inc.*, 472 U.S. 1, 9 (1985)).  While the Third Circuit ultimately applied the *Chevron* doctrine and deferred to the SEC's interpretation of the Williams Act, *id*. (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)), the Supreme Court has recently granted certiorari to address whether *Chevron* should be overruled, *see Relentless Inc. v. Dep't of Commerce*, No. 22-1219 (2023); *Loper Bright Enters. v. Raimondo*, 143 S. Ct. 2429 (2023).  As a result, there are serious questions as to the continued validity of the All Holders Rule and the Best Price Rules.  *See* Thomas Lee Hazen, Treatise on the Law of Securities Regulation, 3 Law Sec. Reg. § 11:21 (June 2023) (observing that "[t]here is no explicit statutory requirement that a tender offer be made to all shareholders, nor that each tendering security holder be offered the best price").  Similarly, *Polaroid*'s conclusion that Section 14(d) has a private right of action was incorrect, and relied on Supreme Court precedent that has since been called into question. *Compare Polaroid*, 862 F.2d at 995–96 (implying a private right of action under Section 14(d) "[i]n light of . . . *Borak*," which at the time was "the leading Supreme Court case on the implication of private remedies" (citing *J.I. Case Co. v. Borak,* 377 U.S. 426 (1964))), *with Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) (explaining that *Borak* belonged to an "ancient regime" of Supreme Court opinions that "followed a different approach to recognizing implied causes of action than it follows now" and while the Court would then "as a routine matter . . . imply causes of action not explicit in the statutory text itself," the Court has since "adopted a far more cautious course" that relies on statutory intent).  Nuvei expressly preserves the argument that the All Holders Rule and the Best Price Rule are invalid as beyond the scope of the SEC's authority under the Williams Act and that there is no private right of action to enforce either rule.

14

Rule and the Best Price Rule, neither of which entitles Plaintiffs to a windfall on incentive shares that failed to meet agreed-upon financial benchmarks.

### A. Plaintiffs Fail to Plead a Violation of the All Holders Rule

Plaintiffs' claim under Section 14(d) and Rule 14D-10(a)(1) promulgated thereunder (the "All Holders Rule") must be dismissed because Plaintiffs' Earnout Shares were forfeited and not available at the time Nuvei accepted any shares for payment in the Offer. *See supra* at 10-11. Moreover, the Earnout Shares are not the same "class" of securities as those subject to the Offer, and even if they were, Nuvei's refusal to accept for payment Plaintiffs' Earnout Shares did not violate the All Holders Rule because Plaintiffs voluntarily encumbered those shares and made them ineligible for tender.

### 1. Earnout Shares Were Forfeited and Therefore Not Subject to Acceptance by Nuvei

The All Holders Rule merely requires that a tender offer be "open to all security holders of the class of securities subject to the tender offer." 17 C.F.R. § 240.14d-10(a)(1). Here, by its plain terms, Nuvei's Offer was open to all holders of Paya common stock. D.I. 1-4 at 1 (offering to purchase, subject to terms and conditions set forth in the Merger Agreement, "any and all of the issued and outstanding shares of [Paya] common stock"). As explained above, Plaintiffs' Earnout Shares were not accepted for purchase because Plaintiffs forfeited those shares immediately prior to Nuvei's acceptance of any shares for payment. That is not inconsistent with the All Holders Rule. Nothing in that rule abrogates Plaintiffs' express agreement governing the forfeiture of the Earnout Shares or required Nuvei to accept the shares that were forfeited before Nuvei's acceptance of any shares for payment.

15

### 2.    Earnout Shares Were Not "of the Same Class" as General Common Stock

The All Holders Rule also would not have required Nuvei to purchase the Earnout Shares because they were not of the same character as other Paya common stock.  The All Holders Rule was promulgated to "ensure fair and equal treatment" to the holders of a class of securities subject to a tender offer.  *Polaroid Corp.*, 862 F.2d at 995 (citing Amendments to Tender Offer Rules; All-Holders and Best Price, 51 Fed. Reg. at 25,876 (July 17, 1986)).  The Rule should be read in light of that purpose and "should not be parsed so finely" that doing so "would yield an absurd result."  *Sedighim*, 167 F. Supp. 2d at 651.

In *Sedighim*, for example, the court rejected as "absurd" the argument that two "vastly different securities with different rights" must be treated the same simply because both were common stock.  *Id.*  The court reasoned that while the word "class" may have a specific meaning in other contexts, "[i]n the context of the [All-Holders] Rule, the word 'class' is best understood more generally as 'type' of security rather than under its narrower, technical meaning."  *Id.*  To be of the same "class" for purposes of the rule, therefore, the securities should be of "substantially similar character and the holders of which enjoy substantially similar rights and privileges."  *Id.* (citing 15 U.S.C. § 78l(g)(5)).

Here, the Earnout Shares were not the same "class" of securities (as that word is used in the All Holders Rule) as other common stock validly tendered and accepted in the Offer because Plaintiffs did not "enjoy substantially similar rights and privileges" as shareholders of unrestricted Paya common stock.  *Sedighim*, 167 F. Supp. 2d at 651 (holding that the All Holders Rule did not require an offeror to purchase shares of common stock that were "vastly different securities with different rights" than the common stock subject to the tender offer).  Plaintiffs, as holders of the Earnout Shares, agreed to restrictions that prevented them from being transferred

16

except in narrow circumstances, and Plaintiffs also agreed that if upon the first Change of Control, the price paid or payable for Paya common stock did not meet a minimum threshold amount of $15.00, then Plaintiffs would forfeit those Earnout Shares.  D.I. 1-2 § 2.2(ii)(3). These restrictions changed the economic bargain represented by the Earnout Shares as compared to common stock not subject to such restrictions and forfeiture.

### 3.    The All Holders Rule Separately Allows the Exclusion of Encumbered Shares Like the Earnout Shares

Plaintiffs also fail to plead any violation of the All Holders Rule because the rule only requires that an offer be *open* to all holders and allows an offeror to decline to purchase certain shares that are ineligible to participate in the tender offer as a result of the shareholders' own actions.

The SEC has recognized that the All Holders Rule does not prohibit an offeror to decline to purchase certain shares if "action taken independently by [that] individual shareholder encumbers the shares and limits the shareholder's ability to participate in the offer."  *In re WHX*, Exchange Act Release No. 47980, 2003 WL 21283081, at *7 (June 4, 2003), *overruled on other grounds by WHX Corp. v. SEC*, 362 F.3d 854 (D.C. Cir. 2004).  For example, the SEC has explained that "shares that have been pledged as collateral for loans and shares held subject to a trust that prevents tender without the consent of the beneficiaries" may be validly excluded from a tender offer, consistent with the requirements of the All Holders Rule.  *Id.*  Here, Plaintiffs voluntarily encumbered their Earnout Shares and agreed to subject those shares to forfeiture provisions and transfer restrictions in Sponsor Support Agreement that made them ineligible for tender under the terms of the Offer.  *See* D.I. 1-2 §2.2(i)-(ii); *see also supra* at 4-6, 11-13.  As a result, the All Holders Rule did not require Nuvei to accept the Earnout Shares (even putting aside that they had already been forfeited at the time of acceptance).

17

The SEC's nonbinding Compliance and Disclosure Interpretations (*see* AC ¶ 105 n.4) do not compel a different conclusion.  That guidance states that an offeror cannot exclude a holder of "restricted securities" from participating in a tender offer because the All Holders Rule requires that the offer "be open to all security holders of the class of the securities subject to the tender offer."  Ex. 4 (Compliance and Disclosure Interpretations on Tender Offer Rules and Schedules).  But "restricted securities," in the vocabulary of the SEC, are securities "acquired directly or indirectly from the issuer . . . in a transaction . . . not involving any public offering," 17 C.F.R. § 230.144(a)(3)—for example, shares issued in a private transaction.  Such securities, while "restricted" from being traded freely in the market, are not subject to forfeiture and do not represent a different economic bargain than general common stock in the same way as the Earnout Shares here do.  That, in some circumstances, restricted securities may be considered the same class as freely tradeable common stock for the purposes of the All Holder Rule says nothing about the Earnout Shares here, which are more akin to shares that are ineligible for tender "for reasons outside of the control of the offeror."  *In re WHX*, Exchange Act Release No. 47980, 2003 WL 21283081, at *7.

Far from ensuring the "equal treatment" that the All Holders Rule contemplates, *see Sedighim*, 167 F. Supp. 2d at 651, requiring Nuvei to pay Plaintiffs $9.75 per share for worthless Earnout Shares would grant Plaintiffs special treatment over other Paya common shareholders and would give Plaintiffs more than what they had fairly bargained for.

**B.      Plaintiffs' Claim Under the Best Price Rule Fails**

Plaintiffs' claim under Section 14(d) and Rule 14D-10(a)(2) promulgated thereunder (the "Best Price Rule") similarly fails because, as demonstrated above (*see supra* at 10-11), Plaintiffs had forfeited their Earnout Shares and thus could not tender them.  In any event, if the Earnout

Shares had not been forfeited (they were), Plaintiffs could not "validly tender" those shares pursuant to the terms of the Offer and thus were not entitled to payment for them.

The Best Price Rule provides that "[n]o bidder shall make a tender offer unless . . . the consideration paid to any security holder pursuant to the tender offer is the highest consideration paid to any other security holder during such tender offer."  17 C.F.R. § 240.14d–10(a)(2).  As with the All Holders Rule, the Best Price Rule is intended to ensure fair and equal treatment to holders of shares subject to a tender offer and prevent discrimination among shareholders.  *See Amendments to Tender Offer Rules; All-Holders and Best Price*, 51 Fed. Reg. at 25,876; *see also In re Luxottica Group S.p.A. Sec. Litig.*, 293 F. Supp. 2d 224, 231 (E.D.N.Y. 2003).  Nuvei did not discriminate in price among validly tendering shareholders.  Pursuant to the terms of the Offer, Nuvei offered to pay $9.75 per share in cash for "any and all of the issued and outstanding shares of [Paya] common stock" that were "validly tendered" and accepted for payment in the Offer.  D.I. 1-4 at i, 10.  That is what Nuvei did.

Plaintiffs complain that Nuvei violated the Rule because they "pa[id] $0 per share for Plaintiffs' Company Common Stock and $9.75 per share for the other common shares of Paya."  AC ¶ 112.  But for the reasons above, Plaintiffs' Earnout Shares were not available for purchase at the Acceptance Time—because Plaintiffs had forfeited their Earnout Shares immediately prior (*see supra* at 10-11), and in any event, could not have "validly tendered" those shares anyway under the terms of the Sponsor Support Agreement (*see supra* at 11-14).  Nuvei did not pay anything for Plaintiffs' Earnout Shares because Plaintiffs had no Earnout Shares available to tender at the time of Nuvei's acceptance for payment of the shares tendered in the Offer.

## III.    Plaintiffs' Claim Under Delaware General Corporation Law Section 251(h) Fails

Plaintiffs' claim under DGCL Section 251(h) should be dismissed because Nuvei complied with the statute by extending an offer to purchase all stock entitled to vote on the

proposed merger. Nothing in the statute requires that Nuvei *also* purchase every share purportedly tendered, even if it is forfeited, encumbered, or otherwise ineligible to participate in the Offer.

Section 251(h) permits a merger to take place via a tender offer without a shareholder vote on the merger agreement. *See In re Volcano Corp. Stockholder Litig.*, 143 A.3d 727, 741 (Del. Ch. Ct. 2016). To effectuate this type of merger, also referred to as a "two-step merger," Section 251(h) specifies that the merger may be completed where "[a] corporation *consummates an offer for all of the outstanding stock of* such constituent corporation on the terms provided in such agreement of merger that, absent this subsection, w*ould be entitled to vote on the adoption or rejection of the agreement of merger*." 8 *Del. C.* § 251(h)(2) (emphasis added).

Consistent with Section 251(h)(2), Merger Sub commenced the Offer to purchase "any and all of the issued and outstanding shares of common stock of Paya" on January 24, 2023. AC ¶¶ 91-92. Nothing more is required under Section 251(h)(2). The Offer also included a number of customary terms and requirements that must be met by a shareholder attempting to tender shares in the Offer. As explained above (*see supra* at 10-14), Nuvei properly rejected Plaintiffs' Earnout Shares because they were forfeited, and Plaintiffs were unable to meet a number of the standard conditions to validly tender them. Because nothing in Section 251(h) vitiates these customary procedures and obligated Nuvei to blindly purchase all shares tendered, even if they were forfeited or otherwise not validly tendered, Plaintiffs' Section 251(h) claim should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Amended Complaint with prejudice.

20

MORRIS, NICHOLS, ARSHT
& TUNNELL LLP

*Of Counsel*                                                  */s/ Kevin M. Coen*
                                                             Kevin M. Coen (#4775)
DAVIS POLK & WARDWELL LLP                                     1201 N. Market Street
Brian M. Burnovski                                           P.O. Box 1347
Matthew Cormack                                              Wilmington, DE 19899-1347
Chui-Lai Cheung                                              kcoen@morrisnichols.com
450 Lexington Avenue                                         (302) 351-9301
New York, NY 10017                                               *Attorneys for Defendants Nuvei*
Telephone: (212) 450-4000                                       *Corporation and Pinnacle Merger*
                                                               *Sub, Inc.*

November 15, 2023

21