## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PAWNEET ABRAMOWSKI et al.,

                Plaintiffs,

      v.

NUVEI CORPORATION and PINNACLE
MERGER SUB, INC.,

                Defendants.

C.A. No. 23-965-GBW

---

Derrick B. Farrell, BLEICHMAR FONTI & AULD LLP, Wilmington, DE; Javier Bleichmar, Evan A. Kubota, Thayne Stoddard, BLEICHMAR FONTI & AULD LLP, New York, NY.

       *Counsel for Plaintiffs*

Kevin M. Coen, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Brian M. Burnovski, Matthew Cormack, Chui-Lai Cheung, DAVIS POLK & WARDWELL LLP, New York, NY.

       *Counsel for Defendants*

## MEMORANDUM OPINION

October 17, 2024
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Pending before the Court is (1) Defendant Nuvei Corporation ("Nuvei Corporation") and Defendant Pinnacle Merger Sub, Inc.'s ("Merger Sub") (together, "Defendants") Motion to Dismiss the Amended Complaint ("AC") (D.I. 11), which has been fully briefed (D.I. 12; D.I. 20; D.I. 22); and (2) Plaintiffs' Motion for Summary Judgment (D.I. 19), which has also been fully briefed (D.I. 20; D.I. 22; D.I. 26). For the following reasons, the Court GRANTS Defendants' motion and DENIES-AS-MOOT Plaintiffs' motion.

## I.    SUMMARY OF FACTS

### A.    Paya Holdings, Inc. Becomes Public in a De-SPAC Transaction

The genesis of this dispute involves the merger of Paya Holdings, Inc. ("Paya"), when it was a privately held corporation, with FinTech Acquisition Corp. III, a "special-purpose-acquisition corporation" or "SPAC." "Ordinarily, a privately held corporation becomes a publicly traded corporation through an initial public offering (an 'IPO'), a process entailing various legal requirements and associated expenses." *In re Lottery.com, Inc. Sec. Litig.*, No. 22-cv-07111-JLR, 2024 U.S. Dist. LEXIS 20645, at *5 (S.D.N.Y. Feb. 6, 2024) (citation omitted). A SPAC, however, "offer[s] another route for a private company to go public," i.e., through what "is often referred to as a de-SPAC transaction." *See id.* at *5-6. De-SPAC transactions begin "with a sponsor forming a corporation and [taking] the SPAC public in an IPO." *Id.* at *5. Thereafter, the SPAC merges with the "privately held operating company." D.I. 9 (AC) ¶ 75. Upon merger, "the operating company becomes public and gets to use the capital of the now-dissolved shell company." D.I. 9 (AC) ¶ 75.

On August 3, 2020, FinTech Acquisition Corp. III entered into a merger agreement (the "FinTech Merger Agreement") to "allow Paya to become a publicly traded company." D.I. 9 (AC) ¶ 75; *see also* D.I. 1 Ex. 1 (FinTech Merger Agreement). On the same day, various entities and individuals "entered into a sponsor support agreement" (the "SSA") to support the merger. D.I. 9 (AC) ¶ 76. "On October 16, 2020, Paya completed the" merger. *Id.* ¶ 80. On "October 19, 2020, Paya became a publicly traded company." *Id.* ¶ 81.

**B.      Plaintiffs' Earnout Shares**

Here, each "of the Plaintiffs held" Earnout Shares of Paya that were subject to the terms of the SSA. D.I. 9 (AC) ¶ 13; *see also* D.I. 1 Ex. 2 (SSA) Schedule 1 (confirming total of 5,681,812 Earnout Shares). Critically, § 2.2(ii)(3) of the SSA provides that "if the price per share paid . . . to the stockholders of [Paya] in connection with the first Change in Control to occur during the Earnout Period [October 16, 2020 to October 16, 2025] is less than the Minimum Target [$15.00], then . . . *all of the Earnout Shares shall be automatically forfeited immediately prior to the consummation of such Change of Control.*" D.I. 1 Ex. 2 (SSA) § 2.2(ii)(3) (emphasis added); *id.* § 2.2(i)(1) (confirming $15.00 was the Minimum Target); D.I. 1 Ex. 1 (FinTech Merger Agreement) § 4.05 (defining the "Earnout Period" as "[f]rom and after the Closing until the fifth anniversary of the Closing Date"); D.I. 1 Ex. 2 (SSA) at 1 (incorporating the FinTech Merger Agreement's definition of "Earnout Period").

A "Change in Control" occurs when any "one Person . . . or more than one Person that are Affiliates or that are acting as a group" acquire "more than 50% of the total voting power or economic rights of the equity securities of" Paya. D.I. 1 Ex. 1 (FinTech Merger Agreement) at 6; *see also* D.I. 1 Ex. 2 (SSA) at 1 (incorporating the FinTech Merger Agreement's definition of "Change in Control").

3

C.     **Nuvei and Merger Sub Acquire Paya**

On January 8, 2023, Paya entered into a merger agreement with Nuvei and Merger Sub (the "Nuvei Merger Agreement"). D.I. 13 Ex. 2. The Nuvei Merger Agreement contemplated a two-step merger under "Section 251(h) of the Delaware General Corporation Law." D.I. 9 (AC) ¶¶ 2, 83; *see also* D.I. 13 Ex. 2 (Nuvei Merger Agreement) § 2.3(a) (same); *Cummings v. Koninklijke Philips Elecs.*, No. 02-2121SI, 2002 U.S. Dist. LEXIS 23383, at *9 (N.D. Cal. Nov. 25, 2002) ("A two-step merger is a merger when the bidder acquires a controlling interest in a target and subsequently acquires the balance of equity securities in the merger." (cleaned up)).

On January 24, 2023, in accordance with the Nuvei Merger Agreement, "Nuvei caused Merger Sub to commence" (D.I. 9 (AC) ¶ 92) the tender offer (the "Offer") to purchase "any and all of the issued and outstanding shares of common stock" of Paya at $9.75 per Share (D.I. 1 Ex. 4 (the Offer) at 1). The Offer was made "pursuant to" the Nuvei Merger Agreement and "upon the terms and subject to the conditions set forth in [the Offer] and in the related Letter of Transmittal." D.I. 1 Ex. 4 (the Offer) at 1; *see also id.* at ii, § 15 (requiring satisfaction of "the Minimum Condition," i.e., ownership of more "than 50% of the" shares "outstanding as of the consummation"). Plaintiffs assert that they timely tendered their Earnout Shares in response to the Offer. D.I. 9 (AC) ¶ 98.

On February 22, 2023, at midnight, Merger Sub's Offer expired (the "Offer Expiration Time"). D.I. 21 Ex. 3 (Schedule TO) at 1. "[P]romptly after," Defendants consummated the Offer and "irrevocably accept[ed] for payment all Shares validly tendered and not validly withdrawn" (the "Acceptance Time"). D.I. 1 Ex. 4 (the Offer) § 1; *see also* D.I. 9 (AC) ¶ 101 ("The Transaction closed on February 22, 2023."). Upon consummation, Nuvei acquired a majority ownership in Paya. D.I. 21 Ex. 3 (Schedule TO) at 1 (confirming "83.49%" ownership). "[I]mmediately prior to" Acceptance Time, Plaintiffs "forfeited" all of their Earnout Shares. D.I. 1 Ex. 2 (SSA) §

4

2.2(ii)(3).  Later that day, the depositary agent informed Plaintiffs that their Earnout Shares had "not been accepted."  D.I. 1 Ex. 5 (Rejection E-mail) at 1.

The second step of the two-step merger is not at issue.

## II.    PROCEDURAL HISTORY

On September 1, 2023, Plaintiffs filed a complaint (D.I. 1) and, on September 26, 2023, Plaintiffs filed the AC (D.I. 9).  Plaintiffs assert that Defendants inappropriately refused "to accept Plaintiffs' tender of" their Earnout Shares and pay Plaintiffs $9.75 per share in accordance with Defendants' Offer.  D.I. 9 (AC) ¶ 1.  Plaintiffs claim violations of the: (1) the Nuvei Merger Agreement; (2) the All Holders Rule, i.e., 17 C.F.R. § 240.14d-10(a)(1), promulgated pursuant to 15 U.S.C. § 78n(d); (3) the Best Price Rule, i.e., 17 C.F.R. § 240.14d-10(a)(2), promulgated pursuant to 15 U.S.C. § 78n(d); and (4) the two-step merger provisions in 8 Del. C. § 251(h).  D.I. 9 (AC) ¶¶ 102-30.  Plaintiffs seek "$50,415,017.25, plus interest."  D.I. 20 at 8-9.

In accordance with the Court's order (D.I. 10) granting the parties' proposed scheduling order (D.I. 7), Defendants moved to dismiss, and Plaintiffs filed a single memorandum both opposing Defendants' motion and also supporting a simultaneous motion for summary judgment.  While the Court does not attempt to summarize every argument here, the principal contention upon which Defendants rely to support dismissal of all claims is that "Plaintiffs' Earnout Shares were forfeited before Nuvei accepted any shares for purchase, and therefore Nuvei could not have purchased the Earnout Shares from Plaintiffs."[1]  *See* D.I. 12 at 10-11.  Plaintiffs disagree, and also contend that Defendants accepted the "risk of loss" as to the Earnout Shares prior to any forfeiture, and that Defendants lack standing to enforce the relevant forfeiture provisions.  *See D.I.* 20.

---

[1] Defendants also contend with force that Plaintiffs' Earnout Shares were subject to transfer restrictions preventing Defendants from accepting Plaintiffs' Earnout Shares.  In light of the Court's conclusion that forfeiture precludes acceptance, the Court does not reach this contention.

III.    **JURISDICTION AND LEGAL STANDARDS**

A.    **Jurisdiction**

This Court has federal question jurisdiction over Plaintiffs' federal securities claims under

28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Plaintiffs' remaining claims since

they "are so related" to the federal securities claims "that they form part of the same case or

controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).

B.    **Motion to Dismiss**

To state a claim on which relief can be granted, a complaint must contain "a short and plain

statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Such

a claim must plausibly suggest "facts sufficient to 'draw the reasonable inference that the defendant

is liable for the misconduct alleged.'"  *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022)

(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 557 (2007)).  "A claim is facially plausible 'when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged.'"  *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021)

(quoting *Iqbal*, 556 U.S. at 678).  But the Court will "'disregard legal conclusions and recitals of

the elements of a cause of action supported by mere conclusory statements.'"  *Princeton Univ.*, 30

F.4th at 342 (quoting *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016)).

In evaluating a motion to dismiss, "'[t]he issue is not whether a plaintiff will ultimately

prevail but whether the claimant is entitled to offer evidence to support the claims.'"  *Pinnavaia v.*

*Celotex Asbestos Settlement Tr.*, 271 F. Supp. 3d 705, 708 (D. Del. 2017) (quoting *In re Burlington*

*Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997)), *aff'd*, 2018 U.S. App. LEXIS 38873

(3d Cir. Apr. 6, 2018).  Rule 12(b)(6) requires the Court to "accept all factual allegations in a

complaint as true and take them in the light most favorable to Plaintiff."  *Brady v. Media*, No. 23-

cv-1078-GBW, 2024 U.S. Dist. LEXIS 160991, at *4 (D. Del. Sep. 6, 2024). "A motion to dismiss 'may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief.'" *McCrone v. Acme Markets*, 561 F. App'x 169, 172 (3d Cir. 2014) (quoting *Burlington Coat Factory*, 114 F.3d at 1420). The "movant bears the burden of demonstrating that the complainant failed to state a claim upon which relief may be granted." *Abbott Diabetes Care, Inc. v. DexCom, Inc.*, No. 23-cv-239-KAJ, 2024 U.S. Dist. LEXIS 96985, at *4 (D. Del. May 31, 2024).

C.    **Motion for Summary Judgment**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact is one that could lead a reasonable jury to find in favor of the nonmoving party." *Bletz v. Corrie*, 974 F.3d 306, 308 (3d Cir. 2020). "The court must review the record as a whole, draw all reasonable inferences in favor of the nonmoving party, and must not 'weigh the evidence or make credibility determinations.'" *Id.* at 308 (quoting *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016)).

IV.    **DISCUSSION**

A.    **Motion to Dismiss**

Plaintiffs fail to state a claim upon which relief can be granted as to each claim in the AC, i.e., purported violations of (1) the Nuvei Merger Agreement; (2) the All Holders Rule; (3) the Best Price Rule; and (4) 8 Del. C. § 251(h). Plaintiffs' contentions that Defendants accepted the purported risk of loss and lack standing to enforce Plaintiffs' forfeiture also fail as a matter of law.[2]

---

[2] In their brief opposing Defendants' motion to dismiss and supporting their motion for summary Judgment, Plaintiffs state that both parties recognize "that this case almost exclusively presents legal rather than factual issues." D.I. 20 at 1. That recognition, according to Plaintiffs, is why "the

In rendering these conclusions, the Court relies on several documents that are either incorporated by reference into the AC or judicially noticed by this Court, including:

1. Form S-1 Registration Statement of Fintech Acquisition Corp. III (D.I. 13 Ex. 1) (dated October 23, 2018);

2. FinTech Merger Agreement (D.I. 1 Ex. 1) (dated August 3, 2020);

3. SSA (D.I. 1 Ex. 2) (dated August 3, 2020);

4. Nuvei Merger Agreement (D.I. 13 Ex. 2) (dated January 8, 2023);

5. The Offer (D.I. 1 Ex. 4) (dated January 24, 2023);

6. Letter of Transmittal (D.I. 13 Ex. 3) (dated January 24, 2023);

7. Schedule TO (D.I. 21 Ex. 3) (dated February 22, 2023); and

8. E-mail with the Subject Line "Paya Holding Inc Tender Offer Notice" (D.I. 1 Ex. 5) (dated February 22, 2023).

*See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, we may consider documents that are attached to or submitted with the complaint, and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, and items appearing in the record of the case." (cleaned up)).

The FinTech Merger Agreement, SSA and Nuvei Merger Agreement are governed by Delaware law. *See* D.I. 1 Ex. 1 (FinTech Merger Agreement) § 12.06; D.I. 1 Ex. 2 (SSA) § 4.2; D.I. 13 Ex. 2 (Nuvei Merger Agreement) § 9.8; *see also* D.I. 1 Ex. 4 (the Offer) at 64 (confirming that the Nuvei Merger Agreement is governed by Delaware Law).

---

parties stipulated to a schedule whereby Defendants would move to dismiss, and Plaintiffs would simultaneously oppose that motion and move for summary judgment." *Id.*

1. **Plaintiffs' Claim for Breach of the Nuvei Merger Agreement Fails as a Matter of Law**

Plaintiffs fail to state a claim upon which relief can be granted as to the Nuvei Merger Agreement.

As described above, the Nuvei Merger Agreement provides that the Earnout Shares were "subject to earnout and forfeiture in accordance with the terms of the" SSA. D.I. 13 Ex. 2 (Nuvei Merger Agreement) § 3.6(a). In turn, § 2.2 of the SSA provides that "if the price per share paid . . . to the stockholders of [Paya] in connection with the first Change in Control to occur during the Earnout Period is less than the Minimum Target [i.e., $15.00], then . . . *all of the Earnout Shares shall be automatically forfeited immediately prior to the consummation of such Change of Control.*" D.I. 1 Ex. 2 (SSA) § 2.2(ii)(3) (emphasis added). A "Change in Control" occurs when any "one Person . . . or more than one Person that are Affiliates or that are acting as a group" acquire(s) "more than 50% of the total voting power or economic rights of the equity securities of" Paya. D.I. 1 Ex. 1 (FinTech Merger Agreement) at 6.

On February 22, 2023, "Defendants completed their acquisition of Paya." D.I. 9 (AC) ¶ 3. Such acquisition constituted a Change in Control because Defendants acquired "more than 50% of the total voting power or economic rights of the equity securities of [Paya]." *See* D.I. 1 Ex. 1 (FinTech Merger Agreement) at 6; *see also* D.I. 21 Ex. 3 (Schedule TO) at 1 (confirming that Defendants acquired "83.49%" ownership). Aside from Plaintiffs' Earnout Shares, Defendants paid $9.75 for each share tendered. D.I. 9 (AC) ¶ 100; D.I. 21 Ex. 3 (Schedule TO) at 1.

Plaintiffs' Earnout Shares were "forfeited immediately prior to the consummation of [the] Change of Control" because this was "the first Change in Control to occur during the Earnout Period," and because the price paid per share was "less than the Minimum Target" of $15.00. *See* D.I. 1 Ex. 2 (SSA) § 2.2(ii)(3). Upon forfeiture, Plaintiffs did not own any shares that Defendants

9

could have purchased or excluded and, thus, Defendants did not breach the Nuvei Merger Agreement.

Plaintiffs raise two contentions with respect to timing, but each is without merit. First, Plaintiffs contend that Defendants "produced no evidence of when the Acceptance Time, and thus any purported forfeiture, occurred." D.I. 20 at 8. However, the exhibits show that Acceptance Time occurred "immediately" after forfeiture (D.I. 1 Ex. 2 (SSA) § 2.2(ii)(3)) and "promptly" after Offer Expiration Time (D.I. 1 Ex. 4 (the Offer) § 1). Second, Plaintiffs contend that "251(h), the SEC Rules, and the Merger Agreement each clearly required Defendants to pay for all shares tendered at the expiration of the Offer." D.I. 26 at 1. However, and again, Defendants were not required to make any payment until "promptly after . . . the Offer Expiration Time." D.I. 1 Ex. 4 (the Offer) § 1.

Separate from timing, Plaintiffs flag the term "all" in the Nuvei Merger Agreement's requirement that Defendants commence "the Offer to purchase all of the outstanding shares" of Paya. In particular, Plaintiffs argue that the term "all" here means that Defendants were required to purchase Plaintiffs' Earnout Shares. D.I. 20 at 23. However, Defendants were not required to *purchase* all of the outstanding shares of Paya; rather, Defendants were required to "*[o]ffer* to purchase all of the outstanding shares." D.I. 13 Ex. 2 (the Nuvei Merger Agreement) § 2.1(a). In any event, the requirement to commence the offer is "[s]ubject to the terms and conditions" of the Nuvei Merger Agreement (*id.*), terms and conditions of which unequivocally result in forfeiture.

For the foregoing reasons, Defendants have sufficiently demonstrated that Plaintiffs have failed to state a claim for breach of the Nuvei Merger Agreement. The Court does not address the parties' remaining and now-mooted arguments. *See, e.g.*, D.I. 12 at 11-14 (regarding validity of tender).

**2.     Plaintiffs' Claim Under the All Holders Rule Fails as a Matter of Law**

Plaintiffs fail to state a claim upon which relief can be granted as to the All Holders Rule.

The All Holders Rule provides that a bidder's tender offer must be "open to all security holders of the class of securities subject to the tender offer." 17 C.F.R. § 240.14d-10(a)(1); *see also Polaroid Corp. v. Disney*, 862 F.2d 987, 991-92 (3d Cir. 1988) (same). Consistent with the All Holders Rule, Defendants' tender offer was "open to all security holders of the class of securities subject to the tender offer." *See* 17 C.F.R. § 240.14d-10(a)(1); *see also* D.I. 1 Ex. 4 (the Offer) at 1 (offering to purchase, subject to terms and conditions set forth in the Merger Agreement, "any and all of the issued and outstanding shares of [Paya] common stock"). Plaintiffs did not forfeit their Earnout Shares until *after* Offer Expiration Time, when the Offer was no longer open to *any* securities holder, and thus when the All Holders Rule was no longer applicable.

Plaintiffs emphasize the terms "all" and "open" in the Rule to contend that Defendants violated the Rule. However, each emphasis is unavailing. *First*, Plaintiffs contend that the term "all" in the All Holders Rule means that "Defendants had to accept Plaintiffs' tenders of" their Earnout Shares. D.I. 20 at 3, 13-14. As explained in the preceding paragraph, however, the All Holders Rule imposes an obligation upon Defendants to keep their Offer open to "all" only until Offer Expiration Time, and Defendants satisfied this obligation. *Second*, Plaintiffs contend that Defendants' offer was not "open" to Plaintiffs since their Earnout Shares were "effectively excluded." D.I. 20 at 18. Again, however, Defendants' Offer was "open" to Plaintiffs during the period of time encompassed by the Rule. Since Defendants did not exclude Plaintiffs and their Earnout Shares, any requirement to seek an "exemption to exclude" under 17 C.F.R. 240.14d-10(f) is not applicable. *Cf.* D.I. 20 at 19 (contending that Defendants should have requested an exemption).

11

Plaintiffs claim that *Polaroid Corp.* held that the All Holders Rule is violated when a bidder "excludes shares from a tender offer that the bidder contends are 'invalid.'" D.I. 20 at 18 (quoting 862 F.2d 987, 992 (3d Cir. 1988)). Otherwise, a "tender offeror would merely need to declare the invalidity of the shares that it did not wish to purchase and then proceed as if the All Holders Rule did not exist." D.I. 20 at 18 (quoting 862 F.2d 987, 992 (3d Cir. 1988)). However, the Third Circuit did not reach such a holding. Rather, the portion of the decision that Plaintiffs quote is the Third Circuit's recitation of an argument by one of the parties therein, not a holding of the Third Circuit. *See Polaroid Corp.*, 862 F.2d at 992. In fact, the Third Circuit held that Polaroid did "not have standing to raise a claim under the All Holders Rule" and thus did "not determine the merits of the district court's denial of Polaroid's motion for a preliminary injunction on this issue." *Id.* at 1002. In any event, *Polaroid* is readily distinguishable since the case concerned validity and not forfeiture.

As Plaintiffs observe, the broad scope of the All Holders Rule "comports with the Williams Act's purpose: 'to eliminate discriminatory treatment among security holders who may desire to tender their shares.'" D.I. 20 at 13 (citing SEC Release No. 6653, 1986 WL 703866, *3 (July 11, 1986)). That broad scope and underlying purpose, however, are neither offended nor contravened by Defendants' non-acceptance of Plaintiffs' Earnout Shares due to forfeiture.

For the forgoing reasons, Defendants have sufficiently demonstrated that Plaintiffs have failed to allege a plausible violation of the All Holders Rule. As such, the Court does not consider the parties' remaining and now-mooted arguments. *See, e.g.*, D.I. 12 at 16 (regarding whether the Earnout Shares were "of the Same Class"); D.I. 20 at 20 (regarding the SEC's interpretations of the tender offer rules).

### 3.     Plaintiffs' Best Price Rule Claim Fails as a Matter of Law

Plaintiffs fail to state a claim upon which relief can be granted as to the Best Price Rule.

The Best Price Rule provides that the "consideration paid to any security holder for securities tendered in the tender offer is the highest consideration paid to any other security holder for securities tendered in the tender offer." 17 C.F.R. § 240.14d-10(a)(2); *see also In re Dig. Island Sec. Litig.*, 357 F.3d 322, 332 (3d Cir. 2004) (same). Consistent with the Best Price Rule, the consideration that Defendants "paid to any security holder for securities tendered in the tender offer" was $9.75, i.e., the "highest consideration paid to any other security holder for securities tendered in the tender offer." *See* 17 C.F.R. § 240.14d-10(a)(2); *see also* D.I. 21 Ex. 3 (Schedule TO) at 1 (confirming Defendants paid "9.75 per Share").

Critically, the Best Price Rule does not require that "consideration [*be*] paid to any security holder for securities tendered." *See* 17 C.F.R. § 240.14d-10(a)(2). Instead, the Rule requires that any "consideration [*actually*] paid" must be "the highest consideration paid to any other security holder." *See id.* Here, the Best Price Rule is not applicable since there was no "consideration paid" to Plaintiffs. Plaintiffs appear to contend that the "consideration paid" to Plaintiffs was "$0." D.I. 20 at 19. However, one cannot offer "nothing as consideration." *Franklin Life Ins. Co. v. Bendas*, 34 F. App'x 847, 849 (3d Cir. 2002).

Plaintiffs' remaining attempts to invoke the Best Price Rule fail. *First*, Plaintiffs contend that the term "any" in the Rule means "that Defendants had to accept Plaintiffs' tenders of" the Earnout Shares. D.I. 20 at 3. Notwithstanding whether the phrase "any security holder" encompassed Plaintiffs, the necessary condition precedent of "consideration paid" was unsatisfied, rendering the Rule inapplicable here.

*Second*, Plaintiffs contend that the Best Price Rule "required Defendants' compliance at the time of tender, not acceptance," i.e., payment. D.I. 26 at 5. As explained in the previous paragraph, however, the Rule is not applicable here, regardless of the purported timing of

13

compliance. Also, the Court observes that the only obligation imposed by the Rule that could require any "compliance" is payment and, on its face, the Rule does not accelerate any payment obligation to the time of tender.

*Third*, Plaintiffs quote Williston on Contracts for the proposition that an open offer requires that Defendants "accept the tender of the offeree." D.I. 26 at 5 (citation omitted). However, Defendants could not accept the tender of Earnout Shares that Plaintiffs had forfeited prior to Acceptance Time. *Fourth*, Plaintiffs contend that this Court's holding would allow issuers to "escape payment simply by inventing their own pretextual excuses for not" accepting tenders. D.I. 26 at 5-6. However, forfeiture here is a contractual obligation and not a "pretextual excuse" invented by Defendants.

*Fifth*, the Court's holding comports with the purpose of the Williams Act "to eliminate discriminatory treatment among security *holders*," which Plaintiffs were not upon forfeiture and before payment. *See* SEC Release No. 6653, 1986 WL 703866, *3 (July 11, 1986) (emphasis added); *cf., e.g.*, (D.I. 20 at 13, 19) (contending otherwise). *Finally*, Plaintiffs contend that "private contracts can[not] excuse violations of federal securities law." D.I. 20 at 20. Defendants have sufficiently demonstrated, however, that no violation of federal securities law occurred.

For the forgoing reasons, Defendants have sufficiently demonstrated that Plaintiffs have failed to allege a plausible violation of the Best Price Rule. The Court does not consider the parties' remaining and now-mooted arguments. *See, e.g.*, D.I. 12 at 19 (regarding validity of the tendered shares).

### 4. Plaintiffs' Claim Under § 251(h) Fails as a Matter of Law

Plaintiffs fail to state a claim upon which relief can be granted as to § 251(h) of Title 8 of the Delaware Code.

14

Here, the Nuvei Merger was a two-step merger under "Section 251(h) of the Delaware General Corporation Law." D.I. 9 ¶¶ 2, 83. Section 251(h)(2) provides, in relevant part, that "no vote of stockholders of a constituent corporation . . . shall be necessary to authorize a merger if" a "corporation consummates an offer for all of the outstanding stock of such constituent corporation on the terms provided in such agreement of merger." Consistent with § 251(h)(2), Defendants consummated "an offer for all of the outstanding stock" of Paya "on the terms provided" in the Nuvei Merger Agreement. *See* 8 Del. C. § 251(h)(2); *see also* D.I. 21 Ex. 3 (Schedule TO) at 1 (confirming consummation). Upon forfeiture of their Earnout Shares, however, Defendants could not consummate the Offer as to those shares, precluding relief under § 251(h). As Defendants observe (D.I. 12 at 20), nothing in § 251(h) "obligated Nuvei to blindly purchase all shares tendered, even if they were forfeited."

Plaintiffs insist (again) that "'all' means all." *See, e.g.*, D.I. 20 at 2, 10-11; *see generally* 8 Del C. § 251(h) (authorizing two-step merger where a "corporation consummates an offer for *all* of the outstanding stock" (emphasis added)). However, § 251(h) requires an "*offer* for all of the outstanding stock," not *consummation* of "all of the outstanding stock." 8 Del C. § 251(h)(2) (emphasis added). The statute yet requires consummation, but subject to "the terms provided in such agreement of merger" (8 Del. C. § 251(h)(2)), and the terms under the Nuvei Merger Agreement result in forfeiture. To hold otherwise, as Defendants observe, "would upend the tender process and provide an unfair windfall to holders of incentive equity in a company that failed to meet the financial benchmarks necessary to obtain their full value." D.I. 12 at 3.

Plaintiffs raise two contentions with respect to timing, but neither of these contentions disarm the Court's conclusion. *First*, Plaintiffs contend that § 251(h) required Defendants to "'irrevocably accept[] for purchase' Paya stock at the time of tender." D.I. 20 at 2 (quoting 8 Del.

15

C. § 251(h)). However, § 251(h) does not require purchase at the time of tender. *See* 8 Del. C. § 251(h). Instead, § 251(h) provides that purchase occurs "on the terms provided in such agreement of merger," here, the Nuvei Merger Agreement. 8 Del C. § 251(h)(2). As described above, the terms of the Nuvei Merger Agreement specify that purchase was to occur promptly after tender.

*Second*, Plaintiffs contend that "the purported forfeiture only occurred *after* Defendants violated their obligation to irrevocably accept for payment Plaintiffs' shares" (D.I. 20 at 3) (emphasis added), i.e., after "consummation" (*see* 8 Del. C. 251(h)(6)(b) (defining "consummates" as "irrevocably accepts for purchase or exchange stock tendered pursuant to an offer")). Plaintiffs turn the SSA on its head, however, as the Earnout Shares were "automatically forfeited immediately *prior* to the consummation." D.I. 1 Ex. 2 (SSA) § 2.2(ii)(3) (emphasis added).

Plaintiffs also raise several concerns in light of the "vote-counting" provisions in § 251(h), but none have merit. *First*, Plaintiffs claim that the depository "received" the Earnout Shares that Plaintiffs tendered and that said Earnout Shares "existed at the time, and for purposes of vote-counting under 251(h)(3)." D.I. 20 at 3, 7-8, 11-12; *see generally* D.I. 1 Ex. 4 (the Offer) at ii, § 15 (requiring ownership of more "than 50% of the" shares "outstanding" to consummate). In light of such receipt and existence, Plaintiffs contend that Defendants had to compensate Plaintiffs for their Earnout Shares "regardless of what happened to those shares after the vote." D.I. 20 at 12. However, Plaintiffs fail to cite any relevant authority showing that such receipt and existence precludes forfeiture, and the Court finds none.

*Second*, Plaintiffs contend that Defendants inappropriately excluded Plaintiffs' Earnout Shares from the population of tendered shares necessary to effectuate the merger. D.I. 20 at 11-12. Defendants admit such exclusion. D.I. 22 at 27. However, whether Defendants should have included Plaintiffs' Earnout Shares in the population of tendered shares necessary to effectuate the

merger is non-dispositive since such inclusion would have only increased the degree to which Defendants exceeded the Minimum Condition. *See generally*, D.I. 21 Ex. 3 at 1 (stating that "a total of 110,558,939" shares were tendered, representing "83.49% of the issued and outstanding" shares); D.I. 1 Ex. 2 (SSA) Schedule 1 (confirming a total of 5,681,812 Earnout Shares).

Insofar as Plaintiffs suggest that any obligation of § 251(h) to include Plaintiffs' tendered Earnout Shares in the population of shares necessary to effectuate the merger also obliges Defendants to subsequently accept Plaintiffs' Earnout Shares, the Court disagrees. Plaintiffs fail to provide any law supporting such obligation. Moreover, any peculiarity resulting from counting but not accepting Plaintiffs' Earnout Shares springs not from a void in the law, but from Plaintiffs' election to bargain for the forfeiture provisions at issue and tender their shares.

Aside from vote-counting, Plaintiffs complain that "[p]ermitting Defendants to selectively reap the benefits of 251(h) while refusing to pay for Plaintiffs' shares eviscerates 251(h)'s requirements and purpose" and "effectively disenfranchises Plaintiffs." D.I 20 at 3, 10; *see also* D.I. 26 at 4 (making similar arguments). Plaintiffs also trumpet that Defendants "had multiple paths" to effectuate their acquisition and chose a path with purported "significant advantages over a traditional merger." D.I. 20 at 1-2. However, the election to effectuate a two-step merger, and the receipt of any advantages thereof, does not affect the statutory analysis herein. Moreover, the purported disenfranchisement of Plaintiffs derives not from Defendants' decision to effectuate a two-step merger, but rather from the bargained-for forfeiture resulting from the Nuvei Merger Agreement and the SSA.

Finally, Plaintiffs contend that § 251(h)(5) "required Defendants to pay Plaintiffs 'the same amount and kind of cash' for shares that were 'not irrevocably accepted' that Defendants 'paid for

shares' of Paya 'irrevocably accepted for purchase or exchange' in the Offer." D.I. 20 at 10

(quoting 8 Del. C. § 151(h)(5)). However, payment cannot occur for that which has been forfeited.

For the forgoing reasons, Defendants have sufficiently demonstrated that Plaintiffs have

failed to allege a plausible violation of § 251(h). The Court does not consider the parties'

remaining and now-mooted arguments. *See, e.g.*, D.I. 22 at 25-26 (regarding whether Plaintiffs

properly tendered the Earnout Shares).

**5.      The Forfeiture of the Earnout Shares Was Not a "Risk of Loss"**

Defendants sufficiently demonstrate that any risk of loss does not encompass the risk of

forfeiture. The Letter of Transmittal provides:

> It is understood that the *method of delivery* of the shares, the certificate(s) and all
> other required documents (including delivery through dtc) is at the election and risk
> of the owner and that the risk of loss of such shares, certificate(s) and other
> documents shall pass only after the depositary has actually received the shares or
> materials (including, in the case of a book-entry transfer, by bookentry confirmation
> (as defined in the offer to purchase)).

D.I. 13 Ex. 3 (Letter of Transmittal) at 4 (emphasis added).

Here, the risk of loss does not include the risk of forfeiture for three key reasons. *First,*

the Letter of Transmittal provides that the risk of loss pertains to "the method of delivery." D.I.

13 Ex. 3 (Letter of Transmittal) at 4; *see Unwired Planet, Inc. v. Microsoft Corp.*, 193 F. Supp. 3d

336, 343-44 (D. Del. 2016) ("As a general rule of construction, Delaware law gives the same word

or phrase the same meaning throughout the contract absent countervailing reasons."). The Letter

does not, however, also provide that any risk of loss also pertains to forfeiture, and "the expression

of one thing is the exclusion of another." *See Obsidian Fin. Grp., LLC v. Identity Theft Guard*

*Sols., Inc.*, No. 2020-0485-JRS, 2021 Del. Ch. LEXIS 74, at *18 (Del. Ch. Apr. 22, 2021).

*Second*, excluding risk of forfeiture from "risk of loss" comports with the definition of

"risk of loss" from the current edition of Black's Law Dictionary: "The chance of bearing the costs

18

that are associated with destruction, damage or the inability of locating goods, documents and other property." Risk of Loss, The Law Dictionary 2d ed. (last accessed October 3, 2024). Here, Plaintiffs' Earnout Shares here were neither destroyed, damaged, nor rendered unlocatable. *Third*, excluding risk of forfeiture from "risk of loss" preserves the effect of both the forfeiture and risk of loss provisions in the underlying documents. *See Victaulic Co. v. ASC Engineered Sols., LLC*, No. 20-cv-887-GBW, 2022 U.S. Dist. LEXIS 180424, at \*5-6 (D. Del. Oct. 3, 2022) (reciting canon of giving "each provision and term effect").

Plaintiffs contend that Defendants could have specified that the risk of loss only applied to the "risk of loss due to damage or destruction." D.I. 26 at 10. However, as mentioned above, the Letter of Transmittal specified that risk of loss pertains to "method of delivery."

For the foregoing reasons, Defendants have sufficiently demonstrated that any risk of loss does not encompass the risk of forfeiture. The Court does not consider the parties' remaining and now-mooted arguments. *See, e.g.*, D.I. 22 at 13 (contending the risk of loss never shifted).

**6.    Defendants Have Standing to Rely on the Forfeiture Provisions**

Plaintiffs contend that "Defendants' forfeiture arguments are irrelevant for the further reason that, because Defendants are not a party to the [S]SA, they lack standing to enforce its terms, including the forfeiture provision." D.I. 20 at 30. As described in the Summary of Facts, however, Defendants acquired Paya in a two-step merger, after Paya merged with FinTech Acquisition Corp. III, and FinTech Acquisition Corp. III is a party to the SSA. D.I. 1 Ex. 2 (SSA) at 1 (stating that the SSA is "by and among . . . FinTech Acquisition Corp. III"). In addition, Defendants are parties to the Nuvei Merger Agreement, which provides that the Earnout Shares "are subject to earnout and forfeiture in accordance with the terms of the Support Agreement." D.I. 13 Ex. 2 (Nuvei Merger Agreement) § 3.6(a). Moreover, Plaintiffs' position that Defendants cannot invoke the forfeiture provisions of the SSA is feeble since (1) Plaintiffs themselves invoke

the benefits of other provisions in the SSA (*see, e.g.*, D.I. 9 (AC) ¶ 77) and (2) Plaintiffs assert that "Defendants' Offer necessarily subjected [Defendants] to the [S]SA." D.I. 20 at 22.

Plaintiffs contend that Defendants cannot rely on forfeiture since their depositary did not specify forfeiture as a basis for not accepting Plaintiffs' tender. D.I. 20 at 30. However, Plaintiffs fail to cite any authority that obliges entities denying tenders of shares to specify each basis for said denial, lest those entities waive said bases, and the Court finds none.

Finally, Plaintiffs also contend that Defendants "waived the forfeiture provisions [of the SSA] when they agreed to the Merger Agreement." D.I. 26 at 8. However, this argument is expressly belied by the Merger Agreement, which adopted the forfeiture provisions of the SSA. D.I. 13 Ex. 2 (Nuvei Merger Agreement) § 3.6(a) (providing that the Earnout Shares "are subject to earnout and forfeiture in accordance with the terms of the Support Agreement").

For the forgoing reasons, Defendants have sufficiently demonstrated that they have standing to rely on the forfeiture provisions at issue.

**B.    Motion for Summary Judgment**

Since the Court is granting Defendants' motion to dismiss, Plaintiffs' motion for summary judgment is moot.

**C.    Sanctions**

The Public Securities Litigation Reform Act provides:

> In any private action arising under this chapter, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

15 U.S.C. § 78u-4(c)(1). Here, Plaintiffs raise such claims (i.e., claims pursuant to 15 U.S.C. § 78n(d)). On the basis of the parties' filings, the Court anticipates that each party and each attorney representing any party has complied with Rule 11(b) of the Federal Rules of Civil Procedure.

Nonetheless, the Court will order the parties to submit individual letters to the Court addressing the propriety of Rule 11(b) sanctions.

## V.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss the Amended Complaint and **DENIES-AS-MOOT** Plaintiffs' Motion for Summary Judgment.  An Order consistent with this Memorandum Opinion will be entered.